THE PEOPLE OF THE STATE OF NEW-YORK, *ex relatione* THE ATTORNEY GENERAL, *against* THE UTICA INSURANCE COMPANY.

An information, in the nature of a *quo warranto*, lies against an incorporated company, for carrying on banking operations without authority from the legislature.

Privileges and immunities of a public nature, which cannot legally be exercised without a legislative grant, are franchises, although they never existed in the people, or could be exercised by them in their political capacity.

Since the *act to restrain unincorporated banking associations, April 11th, 1804,* (sess. 27. c. 117. re-enacted *April 6th,* 1813, sess. 36. c. 71. 2 *N. R. L.* 234.) the right or privilege of carrying on banking operations, by an association or company, is a franchise, which can only be exercised under a legislative grant.

THIS was an information in the nature of a *quo warranto*, filed by the attorney general against the defendants, for exercising banking privileges, without authority from the legislature. The defendants were incorporated by an act of the 29th of *March*, 1816, (sess. 39. c. 52.) and as the questions arising and discussed in this case, related principally to the true construction of the act of incorporation, it becomes necessary to set forth such parts of it, as are material to the points raised on the argument, and decided by the court. These are as follows :

" Whereas it has been represented to this legislature, that incorporating an insurance company which has been formed in the village of *Utica*, will tend to mitigate the awful calamities of fire, to give greater security to manufacturers, and more confidence to those who adventure their property on our vast navigable waters. *And whereas*, it doth appear, that these objects are laudable, and that a company promoting them in the interior of our country, where the profits must necessarily be small, should be liberally encouraged : Therefore :

An information in the nature of a *quo warranto*, for usurping a franchise, need show no title in the people to the franchise, but it lies with the defendant to show his warrant for exercising it.

Where the words of a statute are obscure or doubtful, the intention of the legislature is to be resorted to, in order to discover their meaning.

A thing within the intention, is as much within the statute, as if it were within the letter; and a thing within the letter, is not within the statute, if contrary to the intention of it. Such construction ought to be given as will not suffer the statute to be eluded.

A statute, restraining any *person* from doing certain acts, applies equally to corporations, or bodies politic, although not mentioned.

A corporation has no other powers than such as are specifically granted by the act of incorporation, or are necessary for the purpose of carrying into effect the powers expressly granted.

The *art to incorporate the Utica Insurance Company*, passed *March* 29th, 1816, (sess. 39. c.52 ) does not authorize the company to institute a bank, issue bills, discount notes, and receive deposits, such powers not being expressly granted by the legislature, and not being within their intention, as collected from the act of incorporation; and the company having assumed and exercised those powers, they were held to have usurped a franchise, and on an information in the nature of a *quo warranto*, being filed by the attorney general, judgment of ouster was rendered against them.

" I. *Be it enacted by the people of the state of New-York, re-* ALBANY,
*presented in senate and assembly,* That all such persons as now August, 1818.
are associated, or hereafter shall associate together, for the THE PEOPLE
purpose, shall be, and hereby are constituted and declared UTICA INS. Co.
to be from time to time, and at all times hereafter, from the
passing of this act until the first *Tuesday* of *July,* which will
be in the year 1836, a body politic and corporate, in fact.
and in name, by the name of the " *Utica Insurance Compa-*
*ny ;"* and that by the same name, they and their successors,
during the period aforesaid, shall and may have continual
succession, and shall be capable in law of suing and being
sued, pleading and being impleaded, answering and being
answered unto, defending and being defended, in all courts
and places whatsoever, and in all manner of actions, suits,
complaints, matters and causes whatsoever ; and that they
and their successors may have a common seal, and may
change and alter the same at their pleasure ; and by the
same name be capable of purchasing, holding and convey-
ing any estate real or personal, for the use of the said cor-
poration, in the convenient transaction of its business, and
subject to the restrictions and conditions hereinafter con-
tained.

" II. *And be it further enacted,* that this corporation shall
have full power and authority to make contracts of insu-
rance, with any person or persons, body corporate or poli-
tic, against losses or damages by fire or otherwise, of any
houses, or boats, ships, vessels, or buildings whatsoever, and
of any goods, chattels or personal estate whatsoever, and all
kinds of insurance upon the inland transportation of goods,
wares, or merchandize, for such term or terms of time, and
for such premium or consideration, and under such modifi-
cations and restrictions, as may be agreed on between the
said corporation and the person or persons agreeing with
them ; and in general, of doing and performing in these
operations, all the business generally performed by insurance
companies ; excepting therefrom, that this corporation shall
not engage in loaning any money upon bottomry and respon-
dentia, nor in making any insurance upon any life or lives ;
any thing that may be in the practice or charter of any
other insurance company to the contrary notwithstanding ;

and excepting farther, the restrictions and prohibitions hereinafter contained.

" V. *And be it further enacted,* That if on any anniversary day of election for directors, the stock holders owning two thirds of the whole amount of the stock subscribed to this corporation, shall vote to discontinue the business of the said corporation, it shall be the duty of the directors to cease forthwith from assuming any new risk of insurance, and from doing any new business, or operations of any kind whatever, excepting such as may tend to accelerate the closing of the concerns of the said corporation ; and it shall further be the duty of the said directors, as soon as may be, to dispose of all the property of the said corporation, and to call in all parts of the funds or capital stock of the said corporation, which may have been loaned by the said corporation ; and after the funds and property of the said corporation shall have been thus collected and received, to make an equal division of the same among the stockholders, in the proportion that they shall be equitably entitled to, by the number of shares of the stock of the said corporation which they may respectively own; and after all the property of the said corporation shall have been thus divided and paid over, the said corporation shall cease and be dissolved.

" IX. *And be it further enacted,* That the directors for the time being, shall have power to call and demand from the stockholders respectively, at such time or times as they shall think proper, the remainder of all sums of money by the said stockholders subscribed, &c. *And further,* the said directors shall have power to make and pursue such by-laws, rules and regulations as they shall deem proper, touching the management of the stock, property, estate, effects and concerns of the said corporation, the election of directors, the transfer of stock, the employment of the clerks, officers, servants and agents of this corporation, and the investments of the funds of the corporation, which the business of insurance may not actively employ. *Provided, however,* that such investments, by-laws, rules and regulations, shall not be repugnant to the constitution and laws of this state, or of the *United States,* nor forbidden by this act in the restrictions and prohibitions on this corporation hereinafter contained.

" XII. *And be it further enacted,* That the said corporatiou may receive, take and hold mortgages on any real estate, chattels, or tenements, if the same shall be *bona fide* mortgaged or pledged to the said corporation, or to secure the payment of any debt which may become due to the said corporation, by any means howsoever. And the said corporation shall have power to proceed on the said mortgages, or on any other security, for the recovery of the money thereby secured to them, either at law, or in equity, as any other body corporate, or any individual might, is, or shall be authorized to proceed, were he or it the one to whom the securities had been given. And it shall be lawful for the said corporation to purchase on sales made by virtue either of a judgment at law, or decree or order of a court of equity, or otherwise, and to take any real estate in payment, or towards satisfaction of any debt, or sum of money due to the said corporation, and to hold such real estate, so to be purchased or received, or taken as last aforesaid, until they can conveniently sell, and convert the same into money or other personal property.

" XV. *And be it further enacted,* That at every regular meeting of the board of directors, a majority of the directors present shall be competent to decide on all business and concerns relating to this corporation ; and on the occasional or accidental absence of the president, the board shall be permitted to appoint one or more presidents *pro tempore,* to officiate in his absence, who shall on such occasions be competent to perform all the duties which the president may perform by virtue of any by-law of the corporation ; and any policy or engagement, signed by the president, and attested by the secretary, when done conformably to any by-laws of the directors, shall be valid against, and effectually bind the said corporation, without the presence of a board of directors, and as effectually as if under the seal of the said corporation. *Provided, however,*

" XVI. *And be it further enacted,* That no policies or engagements whatsoever, which shall, as aforesaid, be entered into by this corporation, with any individual, body corporate or politic, either without the seal of this corporation or otherwise, shall be transferable, negotiable, or as-

ALBANY, August, 1818.

THE PEOPLE v. UTICA INS. CO.

signable, so as to give such second holder or assignee a claim on the said corporation, either in his own name or the name of the person originally concerned, unless the consent of this corporation shall have been previously obtained, and endorsed in writing on such instrument, or unless such a privilege form a part of the original agreement, and be expressly granted by this corporation.

" XVIII. *And be it further enacted,* That no part of the funds or capital of this corporation, which the business of insurance may not actively employ, nor any other part or portion of the funds or capital of this corporation, shall at any time be, by the said corporation, either directly or indirectly, employed, to deal or trade in buying or selling any goods, wares, or merchandize ; or in the purchase or sale of any grain or other produce, foreign or domestic ; or in buying or selling any funded or other stock, created by any act of the congress of the *United States,* or of any particular state ; or in buying or selling the stock of any bank ; or in loaning any money, and issuing any notes, as herein-before prohibited. *Provided, however,*

" XIX *And be it further enacted,* That the said corporation shall be permitted to receive any such stock or funds, to make up or secure any part of the capital subscribed to this corporation, or to secure the payment of any debt due to the corporation. And the said stock or funds, after so received, to sell, when the occasions of the company shall require it."

The record in this case was entitled of *August* term, 1817, and after the *placita* proceeded in the following form :

Memorandum.     *Albany, ss.*   Be it remembered, that heretofore, to wit, in the term of *May* last past, at the City Hall of the city of *New-York,* came before the justices of the supreme court of judicature aforesaid, *Martin Van Buren,* attorney general of the people of the state of *New-York,* and for the said people gave their said court, before the justices thereof, then there, to understand and be informed, in manner following, Information.  that is to say : *Martin Van Buren,* attorney general of the people of the state of *New-York,* who sues for the said people in this behalf, comes here before the justices of the people of the state of *New-York,* of the supreme court of

judicature of the same people, on the 16th day of *May*, in the said term, at the City-Hall of the city of *New-York*, and for the said people gives the court here to understand and be informed, that the *Utica Insurance Company*, for the space of six months now last past, and more, have used, and still do use, without any warrant, charter, or grant, the following liberties, privileges and franchises, to wit, that of becoming proprietors of a bank or fund for the purpose of issuing notes, receiving deposits, making discounts, and transacting other business which incorporated banks may and do transact by virtue of their respective acts of incorporation, and also that of actually issuing notes, receiving deposits, making discounts, and carrying on banking operations and other *monied transactions which are usually* performed by incorporated banks, and which they alone have a right to do, of all which liberties, privileges, and franchises, aforesaid, the said *Utica Insurance Company*, during all the time aforesaid, have usurped, and still do usurp upon the said people, to their great damage and prejudice ; whereupon the said attorney of the said people prays advice of the said court in the premises, and due process of law against the said *Utica Insurance Company*, in this behalf to be made to answer to the said people by what warrant they claim to have, use and enjoy the liberties, privileges, and franchises aforesaid.

And now at this day, that is to say, on the fourth day of *August*, in this same term, to which day the said *Utica Insurance Company* had leave to answer the said information, come the said *Utica Insurance Company* by *Nathan Williams*, their attorney, and having heard the said information, complain that they are, by colour thereof, grievously used and disquieted, and this unjustly, because protesting that the said information, and the matters therein contained, are not sufficient in law, to which information the said *Utica Insurance Company* are not bound by the law of the land to answer, yet for plea in this behalf, the said *Utica Insurance Company* say, that by a certain act of the legislature of the people of this state, passed on the twenty-ninth day of *March*, in the year of our Lord 1816, they, the said *Utica Insurance Company*, were constituted and declared to be,

ALBANY,
August, 1818.

THE PEOPLE
v.
UTICA INS. Co.

Imparlance.

Plea.

from the passing of the said act, until the first *Tuesday* of *July*, in the year of our Lord 1836, a body politic and corporate, in fact and in name, and by the name of the *Utica Insurance Company*. And the *Utica Insurance Company* farther say, that by the force of the said act of the said legislature, and the provisions thereof, they still continue to be, and are a body politic and corporate, in fact and in name, and are entitled to do all lawful acts, and to enjoy all the rights, privileges, franchises, and immunities allowed to them, or conferred on them by the said act, or by the law of the land, by virtue whereof the said *Utica Insurance Company*, for all the time in the said information in that behalf mentioned, have used, and still do use, the liberties, privileges, and franchises of becoming proprietors of a bank or fund, for the purpose of issuing notes, receiving deposits, making discounts, and transacting other business, which incorporated banks may do and transact by virtue of their acts of incorporation, by investing in the said bank and business the funds of the said *Utica Insurance Company*, which the business of insurance in the said act mentioned did not actively employ; and the said *Utica Insurance Company* have, during all the said time, used, and still do use, the liberties, privileges, and franchises of actually issuing notes, other than notes which grant or stipulate to pay annuities upon any life or lives, and of actually issuing notes, receiving deposits, making discounts, and carrying on banking operations, and other monied transactions, which are usually performed by incorporated banks. And the said *Utica Insurance Company* have claimed, and yet do claim, to have, use, and enjoy, all the liberties, privileges, and franchises to them belonging, by virtue of the aforesaid act of the said legislature, as it was, and is, lawful for them to do : without this that the said *Utica Insurance Company* have carried on any other monied transactions which incorporated banks alone have a right to do : and also without this, that they have invested any of their funds which the business of insurance mentioned in the said act might actively employ, in the said bank or fund for the purposes aforesaid, or any of them, or for any other purposes repugnant to the constitution and laws of this state, or of the *United States*, or for-

bidden by the said act; and also without this, that the said *Utica Insurance Company* have issued or claimed to issue any notes which grant or stipulate to pay any annuity or annuities upon any life or lives; and without this, that the said *Utica Insurance Company* have usurped the said liberties, privileges, and franchises upon the said people of this state, in manner and form as by the said information is above supposed; all which said several matters and things, they, the said *Utica Insurance Company*, are ready to verify, as the court shall award: whereupon they pray judgment, and that the aforesaid liberties, privileges, and franchises, in form aforesaid, claimed by them, the said *Utica Insurance Company*, may for the future be allowed to them, and that they may be dismissed and discharged by the court hereof and from the premises aforesaid.

And the said *Martin Van Buren*, attorney general of the people of the state of *New-York*, who sues for the said people in this behalf, comes and says, that the said plea and answer of the said *Utica Insurance Company*, by them above pleaded, and the matters therein contained, in manner and form, as the same are above pleaded and set forth, are not sufficient in law to bar the said people from having and maintaining their aforesaid action thereof, against them the said *Utica Insurance Company*, and that he the said *Martin Van Buren*, attorney general as aforesaid, is not bound by the law of the land to answer the same, which he is ready to verify, wherefore, for want of a sufficient plea and answer in this behalf, he prays judgment, and that the said *Utica Insurance Company*, with the liberties, privileges and franchises, may in no way intermeddle, but may be altogether excluded from the same.

*Demurrer.*

And the said *Utica Insurance Company* say, that their said plea and answer, by them above pleaded, and the matters therein contained, in manner and form as the same are above pleaded and set forth, are sufficient in law to bar and preclude the said attorney general from having and maintaining his aforesaid action thereof, against them the said *Utica Insurance Company*, and that they the said *Utica Insurance Company* are ready to verify and prove the same, when, where, and in such manner as the court here shall

*Joinder.*

direct and award : wherefore, inasmuch as the said attorney general has not answered the said plea and answer, nor hitherto in any manner denied the same, the said *Utica Insurance Company* pray judgment, and that the aforesaid liberties, privileges and franchises, in form aforesaid, claimed by them the said *Utica Insurance Company,* may, for the future, be allowed to them, and that they may be dismissed and discharged by the court hereof, and from the premises aforesaid.

*Van Buren,* (*Alt. Gen.*) in support of the demurrer, contended, 1. That the act of the legislature, passed the 29th of *March,* 1816, by which the defendants were incorporated, was not intended by the legislature to confer on the defendants the right of banking, nor did it give that right.   As to the rules to be observed in the construction of statutes, it was only necessary to refer to a few authorities. (*Bac. Abr.* Statute (I. 5.) The intention of the makers of the statute is to be regarded. A thing within the intention of the makers, is as much within the statute, as if it were within the letter.   If any doubt arises on the words of the enacting part of a statute, the preamble may be resorted to for an explanation.   (*Crespigny* v. *Wittenoom,* 4 *Term Rep.* 790. 793.   *Ryall* v. *Rolle,* 1 *Atk.* 174.)   Now, the preamble to this act clearly points out the objects of the incorporation, and the purposes for which the act was passed.   It is not possible to suppose, from the preamble, that it was intended to confer banking powers.

It will be said, perhaps, that as the act contains no special prohibition of banking, it is to be inferred that the legislature intended to permit it.   But there are numerous acts of incorporation passed both before and since the restraining act of the 11th of *April,* 1804, a note of which will be handed to the court, which contain no prohibition of the kind, and yet it was never imagined that any of those corporations possessed banking powers.

2. That the act of the legislature, entitled, " An act to restrain unincorporated banking associations," passed the 11th of *April,* 1804, and revised in 1813, was intended to prevent and restrain all companies and associations, whether

incorporated or not, from banking, unless expressly autho-
rized so to do by the legislature; and does so restrain them.
(sess. 27. ch. 117. 3 *Webst. ed. Laws,* 615. 2 *N. R. L.* 234.
sess. 36. ch. 71. s. 2.) This statute ought to have a liberal
construction; it is remedial, and it should be so construed as
to have its intended effect. A statute, though penal, if
made to remedy an existing evil, will be liberally expound-
ed. (*Hammond* v. *Webb,* 12 *Mod.* 282. *Attorney General* v.
*Sudell, Prec. in Ch.* 216. 6 *Bac. Abr.* 391. Statute, (I. 9.)
During the same session in which the restraining act was
passed, the legislature, *April* 10, 1804, (sess. 27. ch. 110.
3 *Webst. Laws* 611.) declared, that nothing in the said bill,
(then just passed both houses,) should be deemed or con-
strued to prevent any person, association, or company, from
transacting or pursuing any business other than such as
companies or banks, incorporated for the express purpose of
banking, usually do or transact. This legislative declara-
tion was made on the memorial of the chamber of com-
merce of the *City of New-York,* expressing their apprehen-
sion, that the act might be so construed, as to subject indi-
viduals to inconvenient restrictions in their usual commer-
cial business and pursuits.

3. That the defendants, when exercising the privilege of
banking, although they act in their corporate name, do not
act within their corporate powers, and must, therefore, be
regarded, as respects their banking business, as an associa-
tion of individuals unincorporated, and, therefore, within
the words of the restraining act.

4. That the defendants being a body corporate, have no
rights except such as are specially granted to them, or as are
necessary to carry into effect such as are so granted; the
right of banking not being granted, either expressly or by im-
plication, they could not have exercised it, even if no re-
straining act had ever been passed. A body corporate can
act only in the mode prescribed by the law creating it. It
must act up to the end and design of its founder. (*Beatty*
v. *Mar. In. Co.* 2 *Johns. Rep.* 109. 114. *Jackson* v. *Hart-
well,* 8 *Johns. Rep.* 424. 1 *Bl. Com.* 422. 424.)

*Harison* and *T. A. Emmet*, contra. 1. The acts charged against the defendants are not the exercise of *franchises ;* and, therefore, an information in the nature of a writ of *quo warranto* will not lie against them. Franchise or not, is a question of law ; and is not admitted by the demurrer. A franchise is a royal privilege, or branch of the royal prerogative, subsisting in the hands of the subject, by grant from the crown. A writ of *quo warranto* is the king's writ of right, and issues where a franchise is usurped, or forfeited by misuser. (2 *Bl. Com.* 37. *Finch's Law,* 38. 164. 166. 3 *Cruise's Dig.* 278. tit. 27. sect. 1.) The word "franchises" is often used, in common parlance, in a very broad sense, for all liberties, but its legal or technical signification is more confined. A franchise was, always, in *England,* a gem in the royal diadem. It was inherent in the crown from the first institution of monarchy. But the right of banking was never a franchise, or branch of the royal prerogative. The bank of *England* was established in 1694, pursuant to an act of parliament, (5 *W. & M.* cap. 20.) which authorized their majesties, *William* and *Mary,* to grant a commission to take subscriptions from individuals, and to incorporate them. Had the power of banking been a royal franchise, this special authority from parliament would not have been necessary.

In 1697, (8 & 9 *W. & M.* ch. 20. s. 28.) it was enacted that during the continuance of the bank of *England,* no other bank, or any other corporation, society, fellowship, company or constitution, in the nature of a bank, should be erected or established, &c. by act of parliament. This still left individuals and ancient corporations free to bank. But in 1708, (7 *Anne,* ch. 7. s. 61.) it was enacted, that during the continuance of the bank of *England,* it should not be lawful for any corporation, erected, or to be erected, (other than the said bank,) or for any other persons in partnership, exceeding the number of six persons, to take up money on their bills or notes, &c. It is clear, then, that if parliament had not interfered, all corporations might lawfully have carried on banking business ; the act of 7 *Anne,* restraining them, does not declare it unlawful, but merely prohibits the exercise of the power while the bank of *England* continued. It is manifest, therefore, that in *England,* banking was not consi-

dered as a royal franchise ; and private banking is now carried on in that country, by associations of partnership of not more than six persons.

If we look to the acts of our legislature, we shall find that they speak the same doctrine. Numerous acts of in-corporation have been passed since the restraining act of *April* 11, 1804, each of which contain a special clause to restrain the corporation from banking. [Here the counsel enumerated more than *fifty* acts passed since 1804, which, he said, contained a special restraining clause.] It is re-markable, also, that in the same session in which the re-straining act was passed, there was an act of incorporation passed, containing a special prohibition against banking. What stronger evidence can be wanted of the sense of the legislature, that the right of banking is not a franchise, but exists at large in every citizen, and may be freely exercised, unless expressly restrained by the legislature ?

The right was open to every individual, and the defend-ants being created a corporation, have, as its inseparable in-cidents, a perpetual succession, a capacity to sue and be sued, a right to purchase and hold land, to have a common seal, and to make by-laws, &c. (*Kyd on Corp.* 69, 70.) They might, therefore, as well as any individual, carry on banking business, unless expressly prohibited. If, then, this is not a royal franchise, no information in the nature of a writ of *quo warranto* lies ; for these informations have been sub-stituted in the place of that ancient *prerogative* writ. (2 *Co. Inst.* 496. 1 *Bulst.* 55, 56. *Rex* v. *Mursden*, 3 *Burr.* 1817. *per Wilmot*, J.) Not a case can be found in which a writ of *quo warranto* has been brought, or an information in the nature of one filed, for exercising the right of banking. In *The King* v. *Shepherd*, (4 *Term Rep.* 381.) Lord *Kenyon* said, that the old writ of *quo warranto* lay only where there was a usurpation on the rights and prerogatives of the crown ; and that an information in the nature of a *quo war-ranto* could be only granted in such cases. So, in *The King* v. *The Corporation of Bedford Level*, (6 *East*, 359.) *Law-rence*, J. says, it has been always understood, that a *quo warranto* only lay for encroachments on franchises created by the crown.

Again ; for the exercise of any power incidental to a cor-poration or association, a writ of *quo warranto* does not lie. As well might it lie to ascertain by what authority indivi-duals assembled for political purposes. A person entitled to a manor, need not show by what title he holds a court-baron, for that is *incident* to a manor. (*Rex* v. *Stanton, Cro. Jac.* 259, 260.)

But it is said that the restraining act has made banking a franchise ; and that no person can now exercise the right, without showing a legislative grant. Suppose, in *England,* after the restraining act, more than six persons had associ-ated as bankers, would an information, in nature of a *quo warranto,* have been filed against them ? No ; their acts would have been illegal and void. How have the legisla-ture assumed this prerogative and franchise ? How have they taken to themselves what was before the common right of every citizen ? By prohibiting all unincorporated banking associations. Is every thing which is made the subject of exclusive right or grant a franchise, and to be tried by a *quo warranto ?* Ferries, running of *stages,* and *steam-boats,* are made exclusive rights ; yet it has never been supposed that an information in nature of a *quo warranto* would lie in case of any invasion of these rights.

Again ; the restraining act is not in the conjunctive ; it declares that " no person unauthorized by law shall sub-scribe to, or become a member of, any association, institu-tion or company, or proprietor of any bank or fund for the purpose of issuing notes, receiving deposits, making dis-counts, *or* transacting any other business which incorpo-rated banks may, *or* do, transact, by virtue of their respec-tive acts of incorporation." By this act the legislature *assume* the rights specified ; they do not resume a franchise. If the legislature can thus assume all rights common to the citizens, there is no commercial business whatever which they may not prohibit ; and so the Chamber of Commerce apprehended. And on their petition the sections to the act, 27 sess. ch. 110. s. 8 and 9. were passed in explanation of the restraining act. It was, in effect, an act to restrain commercial partnerships or companies ; but the explana-tory sections do virtually repeal the restraining act.

It may be said, that banking is *quasi* a franchise or
branch of prerogative.     But when every individual has
a right to bank, how can it be, in any degree or shape, a
franchise? The act merely restrains associations.     Every
citizen, or inhabitant, may, if he pleases, be a banker.
Can it be possible, that the legislature may assume to itself
the rights of every citizen? Such is not the law of *England.*
If it is the law of any country, it is that of *Turkey,* where
alone, it can be imagined that the common rights of man
should be doled out for the purposes of gain.     The mind
revolts at the idea of a legislature bargaining out the com-
mon rights of the citizen for money.     If the exercise of the
right be injurious, prohibit it.     What is granted should be
given freely.     A contrary doctrine would be attended with
the most pernicious effects.

2. Even if the power of banking be a franchise, we con-
tend, that the act incorporating the defendants confers on
them authority to exercise that franchise.     The meaning of
the legislature must be eviscerated from the act itself.     We
must not regard the declaration of individual members, or
information out of doors.     The frame and scope of the act
must be examined ; we must read the title, the preamble,
its sections and provisions, compare and weigh them alto-
gether.     We must suppose that the legislature meant to
grant what is expressly granted, and to prohibit only what
they have expressly prohibited ; and that every thing not
prohibited is left free.     It is said that no banking power is
expressly given ; we answer, that the exercise of such a
power is not prohibited.     Nay, we contend that it is clearly
granted by the act.     If we look at the *preamble,* after point-
ing out the objects of the incorporation, it says, they ought to
be *liberally* encouraged.     What is the *liberal encouragement*
intended, unless it be the power to invest their surplus
capital in any business not expressly prohibited ?     There are
peculiar features in the act which show that the legislature
intended to specify all the restrictions they thought proper
to impose on the defendants.     [ The counsel here enumera-
ted the restrictions and prohibitions contained in the several
sections of the act.]     After those specific restraints, the de-

fendants are left to employ their surplus capital in any manner which they may deem beneficial. It is not pretended that the defendants have abused their corporate powers, or have diverted funds which ought to be employed in insurances, to other objects. When the legislature specified, with so much caution and precision, what the defendants should not do, why did they not go one step farther, and say, that the defendants should not use their capital in any banking operations whatever ? From their silence and forbearance on this point, is it not to be fairly inferred, that they intended to leave the defendants free to bank, if they thought fit ; especially when we see in another act of incorporation, passed the same session, an express prohibition of banking is inserted ? It is true, we must so construe a statute as to find out the intention of the legislature. But how is that intention to be discovered ? Not by asking the individual members of the legislature what they intended, but by reading the words of the act, and comparing all its parts together.

3. There is nothing in the act of incorporation, nor in any other act or law, that restrains the defendants from carrying on banking business. There is clearly nothing in the constitution or laws of the state that prohibits banking, unless it be found in the act passed the 11th of *April*, 1804, called the restraining act. Individuals had devised a mode of associating and issuing notes, without incurring an individual responsibility ; and that act was passed to restrain *unincorporated* banking associations. The defendants being a regular *corporation*, are not, then, within the *title* of the restraining act. In *Bristol* v. *Barker*, (14 *Johns. Rep.* 205.) this court decided, that the restraining act applied only to associations or companies formed for banking purposes, not to an individual who carried on banking operations on his own credit and account.

Again ; the restraining act inflicts penalties on persons who become members of such associations ; clearly showing that the legislature meant only to prohibit on principles of public policy, and to inflict a punishment ; but how can the members of a regular corporation, like that of the de-

fendants, be subjected to such penalties ? If this general re-
straining act was to have this extended application, why did
the legislature, in almost every subsequent act of incorpora-
tion, insert special clauses to prohibit banking ? If more
was intended, why not declare, at once, that no person should
make or discount a promissory note, without a grant from
the legislature, or a license from the governor ? Every bank
and moneyed institution in the state discount notes. But
the real *mischief* contemplated by the restraining act, was
those associations formed for the purpose of issuing and dis-
counting notes, without any individual responsibility. No
*corporations* were intended to be restrained; but merely
unincorporated associations. The restraining act, then,
does not apply to the *Utica Insurance Company*.

But it is said, that being incorporated for a specific pur-
pose, the defendants can do nothing but the things specified,
or such as are indispensably necessary for those objects;
and that they derive all their power from the act or charter
of incorporation, as the mere creatures of the legislature.
But every corporation has a right to do every act incident to
a corporate body, which is not expressly prohibited. So far
as concerns the disposition of its property, a corporation has
every right and capacity of an individual person, except so
far as it may be expressly limited or restrained. If the act had
said that the defendants should be a body corporate, &c. by
the name of, &c. without any thing further, the powers and
capacities for which we contend follow, as inseparable inci-
dents. (*Kyd*, 69.) A *special* act of incorporation is not so
much a grant of power as a restraint. Every specification
of the rights and powers of the corporation is so far a re-
straint on the general powers it possessed by virtue of its
corporate capacity. *Child* v. *The Hudson's Bay Company*,
(2 *P. Wms.* 207. 209.) though a decision against the defend-
ants, contains the principle for which we contend. Lord
Ch. *Macclesfield* says, " A corporation has an implied power
to make by-laws; but where the charter gives the company
a power to make by-laws, they can only make them in such
cases as they are enabled to do by the charter; for such
power, given by the charter, implies a negative that they
cannot make any other by-laws ; *a fortiori*, they cannot make

by-laws in relation to projects and insurances, which, by act of parliament, are declared to be illegal." It follows, from this reasoning, that if they had no power to make by-laws expressly given, they might have made by-laws in regard to insurances, or any other object, not illegal. A corporation, then, except as to the necessity of using its common seal, may do every thing, in regard to its property, which an individual could do ; it may buy, sell, loan, pledge, &c. If not, what is the use or meaning of the various prohibitions, inserted in the act by which the defendants are incorporated ? They are incorporated not merely for the purpose of insurance, but for other objects. They may *lend* money ; and may make such by-laws, rules, and regulations as they shall deem proper, touching the management of the stock, property, &c. and the *investment of the funds* of the *corporation, which the business of insurance may not actively employ.* (s. 5. & 9.) In various other acts of incorporation, the power of making by-laws, &c. is expressly limited to the single object of the charter. (*Act,* sess. 25. ch. 40. s. 7. *Marine Ins. Co.* ; ch. 67. *Washington Mutual Ins. Co.* sect. 7. ; sess. 28. ch. 72. *Commercial Ins. Co.*) They are incorporated, not for the sole object of making insurances, but for all other purposes, not unlawful, or expressly prohibited. They cannot loan money on bottomry or *respondentia,* nor make insurance on lives, nor grant annuities. (s. 2.) They can employ no part of their funds, not actively used in insurance, in trade, or in buying or selling goods, wares, or merchandizes, or in the purchase or sale of grain or other produce, &c. or in buying or selling stocks, or in loaning money on mortgage. (sect. 18.) Yet they may loan money, and must have some security for it ; and this must be by lending it on bills and notes, or discounting bills, &c. In what other way can they *invest* or employ their surplus capital? Again ; the 16th section enacts, that no policies or *engagements* whatever, &c. shall be transferable, negotiable or assignable, so as, &c. unless the consent of the corporation shall have been previously obtained and endorsed in writing on such instrument, or unless such a privilege form a part of the original agreement, &c. And in the preceding section it is declared, that any policy or *engagement*

signed by the president, and attested by the secretary, when ALBANY, done conformably to the by-laws, &c. shall be valid against, August, 1818; and effectually bind the corporation, without the presence THE PEOPLE of the board of directors, and as effectually as if under the v. seal of the corporation. Are not the defendants, then, em-UTICA INS. CO. powered to make *promissory notes* signed by their president, and attested by their secretary, which shall be valid and binding? If so, the defendants have done nothing unlawful. And if they had, this information is not the proper mode of calling them to an account.

*Van Buren*, in reply. 1. When a party objects to the jurisdiction of a court, he must point out some other juris-diction in which the cause may be tried. When this case was before the court of chancery, on an application for an injunction, (2 *Johns. Ch. Rep.* 371.) the counsel for the de-fendants objected to the jurisdiction of that court, on the ground, that there was an adequate remedy at law, to wit, by an information in the nature of a *quo warranto*, in this court. It is matter of surprise, therefore, that the same counsel should now object, in this place, that an information in the nature of a *quo warranto* is not the proper remedy, without condescending to point out any other possible re-medy whatever. The general demurrer admits, that the power exercised by the defendants is a *franchise;* and it follows, that this is the proper remedy. But is it not a fran-chise? The chancellor had no doubt on the question. He says, that " the right of banking was, formerly, a common law right belonging to individuals, and to be exercised at their pleasure. But the legislature thought proper, by the restraining act of 1804, which has since been re-enacted, to take away that right from all persons not specially authori-zed by law. Banking has now become a franchise derived from the grant of the legislature, and subsisting in those only who can produce the grant; if exercised by other persons, it is the usurpation of a privilege for which a competent remedy can be had by the public prosecutor in the supreme court." This ought, perhaps, to be a sufficient authority on this question. But to pursue it further : A franchise is a liberty or privilege. There is

a distinction between *royal* and *common* franchises; be-
tween those of the sovereign, and those of the people, as the
right of trial by jury.   When the colony became a sovereign
and independent state, the people succeeded to all the rights
and privileges of *English* subjects, and more; they succeed-
ed to all the rights and privileges of the crown or sovereign.
The legislature have, accordingly, from time to time, grant-
ed various exclusive liberties and privileges, or franchises,
to citizens.   By the restraining act of the 11th of *April*, 1804,
the legislature did take to itself the right or liberty of bank-
ing.   What was before common to all, ceased to be so, and
became a franchise or privilege in the government, not to be
exercised by citizens, unless by grant.   Whether this was
a franchise in *England* or not, it is made a franchise
here; and the legislature were competent to make it so.
It is true, that private individuals may bank; but the de-
fendants are an *association* carrying on banking business, in
violation of the act of the 11th of *April*, 1804, passed ex-
pressly to prevent any unauthorized or unincorporated as-
sociation from banking.   Being a privilege, then, which the
defendants could not lawfully exercise without a grant from
the legislature, it comes within the very definition which
has been given of a franchise.   We could not proceed by
indictment, for the act gives a penalty, and not to the peo-
ple, but to the informer.   If this remedy does not lie, there
is no remedy, civil or criminal.   It is, at least, a liberty, *in
the nature* of a franchise, and this is the only and proper
remedy.

2.  What are the actual rights of the sedefendants?  What
privileges did the legislature intend to confer on them?
The intention of the legislature is the great object of inqui-
ry.  It is impossible to define all the considerations which
the court may take into view, to find out that intention:
The *title*, *preamble*, and *provisions* of the act itself; the
*mischief* existing; the *remedy* applied; the temper and cir-
cumstances of the times.

Mentioning that the objects of the defendants were de-
serving of *liberal encouirgement* is, by no means, sufficient to
afford the inference that the legislature intended to confer
banking powers.   If that privilege was intended to be given,

why not say so in express terms? Why should it be left to
be made out by implication and inference? Great pri-
vileges are, in fact, conferred on the defendants, to enable
them to carry into effect the objects of their incorporation,
or insurances. The form of the act, compared with that of
all the acts in which banking powers are conferred, is suffi-
cient to satisfy any reasonable mind, that the legislature ne-
ver intended to give these defendants power to bank. In
all those acts in which the power is given, it is done in clear
and express terms, reciting the petition for the privilege of
banking, and granting it, *eo nomine*. But it is said, that the
real intention of the legislature is of no importance if the
specific powers which they have given amount to a privilege
to bank. The words, " any policies or *engagements*," in
the 15th section, are relied upon; but they do not imply a
power to issue and discount notes. The 16th section de-
clares, that no policy or *engagement* shall be transferable,
negotiable, or assignable, without the consent of the corpo-
ration, &c. But this is not the language in which the le-
gislature uniformly express themselves when they intend to
confer a power to bank, or to issue bank bills or notes.
When they mean to speak of banks, they use the words
" issuing notes, receiving deposits, making discounts," &c.
which constitute the proper business of banking. The 9th
section authorizes the defendants to *invest* the funds of the
corporation, not actively employed in the business of insu-
rance. This does not give the power to *discount* bills or
notes. They may *invest* their surplus funds in stocks, but
they cannot buy and sell stocks; they cannot trade or traf-
fick. So, they may take mortgages or pledges for the secu-
rity of any debts due the corporation.

This act could never have passed the *council of revision*
if it had been capable of a construction that would give to
the defendants the power of banking.

Again; we say the defendants are clearly within the re-
straining act. It is true, the word *corporation* is not used in
that act. It speaks only of any *person* or *persons*. But it
is manifest, especially when it is recollected what was the
situation of things at the time, and what was the *mischief*
intended to be prevented, that it was meant to restrain all

ALBANY,
August, 1818

THE PEOPLE
v.
UTICA INS. CO.

associations, except the regularly incorporated banks, from issuing bank notes. It could not have been the design of the legislature to leave every petty *corporation* in the state free to issue bank paper, at its pleasure. They meant to regulate and restrain banking, and to take into their own hands what was before common and at large. The explanatory act, passed on the petition of the chamber of commerce, shows the intention of the restraining act. No *person, association*, or *company*, are prevented from transacting or pursuing any business, other than such as companies or banks expressly incorporated for the purpose of banking, actually do, or transact.

Again; when the defendants undertook to carry on banking business, they did not act as a corporation, for they had no corporate capacity for that purpose. They are a corporation only while they act within their corporate powers. Would any *turnpike* or *manufacturing* corporation be allowed to set up a *steam boat*, under the pretence that they were not a *person* or *persons* within the words of the act made to protect the proprietors of steam boats? A corporation is a *political person* invested with various capacities. (*Kyd on Corp.* 13. 15. 70.)

THOMPSON, Ch. J. delivered the opinion of the court. The information filed in this case, charges the defendants with engaging in banking operations, without any authority under the act incorporating them, and in violation of the prohibition in the act to restrain unincorporated banking associations. Upon the argument, two questions were raised and discussed; one, involving the general inquiry into the right of the defendants to carry on banking business; and the other, touching the remedy that has been pursued, if no such right exists. I think it unnecessary to enter at large into an examination of the latter question. Upon this point there is no difference of opinion on the bench, and I shall content myself with leaving it to Mr. Justice *Spencer*, while delivering his opinion on this branch of the case. I must be permitted, however, barely to remark, that this is rather an ungracious objection made here, considering the discussion that this case has undergone in the court of chancery,

where it was dismissed for want of jurisdiction in that court to restrain the defendants, because there was a complete and adequate remedy at law, by an information in the nature of a *quo warranto*, and that too conceded by the defendants counsel, as appears from the opinion pronounced in the court of chancery. (2 *Johns. Ch. Rep.* 376.)   I do not mean, however, to conclude the party by that admission.   The objection is properly and rightfully made here, and if well founded, we are bound to yield to it.   But that it is not well founded is, I think, very clear; and the chancellor considered it a question not admitting of any doubt.

With respect to the other branch of the case, as there is some difference of opinion on the bench, it becomes proper and necessary, that I should examine it a little more at large. It may safely be admitted, that formerly the right of banking was a common law right belonging to individuals, and to be exercised at their pleasure.   It cannot, however, admit of a doubt, that the legislature had authority to regulate, modify, or restrain this right.   This they have done by the restraining act of 1804, (sess. 27. ch. 117.) and which has since been re-enacted and continued in full force. (2 *N. R. L.* 234.)   The construction which has been given by this court to the act is, that it extends only to associations or companies formed for banking purposes, and not to an individual who carries on banking operations alone, and on his own credit and account. (14 *Johns. Rep.* 205.)   The right of banking, therefore, by any company or association, has, since the restraining act, become a *franchise* or privilege, derived from the grant of the legislature, and subsisting only in such companies or associations as can show such grant.   The defendants have, accordingly, set up as their authority, or charter, for the exercise of this privilege, an act passed 29th of *April*, 1816, entitled " an act to incorporate the *Utica Insurance Company*."   The real inquiry is, whether this act contains any such grant of banking privileges.

It must certainly strike every person on reading this act, as a little extraordinary, that if banking privileges were intended to be granted, that the usual phraseology of such charters was not adopted.   It certainly could not have

arisen from the legislature being unaccustomed to make. such grants. The numerous charters contained in our statute book precludes any such explanation. We do not find the word *bank*, or any expression that would naturally suggest to the mind any such object, used throughout the whole act. None of the usual, and what may be considered the appropriate and technical, language of such charters is adopted. If any such power is contained in this act, it is certainly not embraced in the general scope and avowed object of the grant; but must be collected from separate and detached parts of the act; and it requires the hand of a skilful workman so to put them together as to frame any thing like the plausible appearance of a banking statute. If this was one of the hidden objects in procuring the incorporation of an insurance company, it is not going too far to say, the legislature must have been deceived and imposed upon; otherwise, no possible reason can be assigned why such privilege should be so concealed and obscurely granted. I do not, however, in construing the grant, mean to travel out of the act itself. But when a right is claimed under it, so manifestly repugnant to the general scope and object of the grant, we ought to keep this in view, when we are looking for the intention of the legislature. And if all parts of the act, and all the terms made use of can be made to apply to the avowed objects of the incorporation, the sound rules of construction will so limit and apply them. That in construing a statute, the intention of the legislature is a fit and proper subject of inquiry, is too well settled to admit of dispute. That intention, however, is to be collected from the act itself, and other acts, *in pari materia.* It may not, however, be amiss to state and keep in view some of the established and well-settled rules on this subject.

Such construction ought to be put upon a statute as may best answer the intention which the makers had in view. And this intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed with reason and discretion, in the construction of the statute, although such

construction seem contrary to the letter of the statute.
Where any words are obscure or doubtful, the intention of
the legislature is to be resorted to in order to find the mean-
ing of the words. A thing which is within the intention of
the makers of a statute is as much within the statute as if it
were within the letter; and a thing which is within the letter
of the statute, is not within the statute, unless it be within
the intention of the makers. And such construction ought to
be put upon it as does not suffer it to be eluded. (*Bac. Abr.
Stat.* I. 5. 10. and authorities there cited.) The two latter
rules are deserving of particular notice in the consideration of
the case before us. When we are endeavouring to find out
the intention of the legislature, in the act incorporating the
*Utica Insurance Company,* we must keep in view the re-
straining act, which makes it unlawful for them to carry on
banking business, unless authorized by their charter so to
do. It was contended, however, upon the argument, that the
restraining act has no application to this company. If that
be so, I do not know but that their charter contains all
the power necessary to carry on banking business. But
I am unable to discover any possible grounds on which they
can claim an exemption from the prohibitions contained in
that act. It declares that no *person* unauthorized by law,
shall subscribe to, or become a member of, any association,
institution, or company, or proprietor of any bank or fund,
for the purpose of issuing notes, receiving deposits, making
discounts, or transacting any other business, which incor-
porated banks may, or do transact, by virtue of their re-
spective acts of incorporation. If the act incorporating the
*Utica Insurance Company* gives them the right of banking,
then, to be sure, they are not within the prohibition of the
restraining act, for they are not unauthorized by law. But
if their insurance charter does not give them banking powers,
so far as they travel out of their grant they act as a com-
pany of private persons, and become a mere association,
doing business without any express authority by law. But
although the restraining act does not, in terms, include
incorporated companies, by expressly declaring that no
*corporation* unauthorized by law, shall become a member of,
or connected with, any banking company, &c. yet the term

ALBANY,
August, 1818.

THE PEOPLE
v.
UTICA INS. Co.

*persons,* there used, will embrace incorporated companies in the prohibition. It was decided by this court in the case of *The Clinton Woollen and Cotton Manufacturing Company* v. *Morse and Bennet,* (*October* term, 1817,) that under the act for the assessment and collection of taxes, *corporations* are liable to be taxed for property owned by them ; yet the act speaks only of *persons* liable to be assessed, and the term corporation is not used at all. So, also, in *England,* a corporation seised of land in fee, for their own profit, are considered *inhabitants* or *occupiers,* within the meaning of the statute, 42 *Eliz.* ch. 2., and liable in their corporate capacity to be rated for the poor tax. (*Cowp.* 73.) And Lord *Coke,* in his exposition of the statute 22 *Hen.* VIII. ch. 5., for the repair of *bridges,* commenting on the word *inhabitants,* with respect to what persons are included under that description, says, every *corporation and body politic,* having lands, &c. are *inhabitants* within the purview of that statute. (2 *Inst.* 703.) If corporations can, under the term *inhabitants,* or *persons,* be subjected to the same burthens to which individuals are subject in the same character, they may, also, very properly, under the same term, be included within the prohibitions in the restraining act. And here one of the rules of construction I have alluded to applies with peculiar force ; that such construction ought to be put upon a statute as does not suffer it to be eluded. Various prohibitory statutes might be referred to, where corporations must necessarily be included under the term *person.* I shall only refer to one. The act for the encouragement of steam boats, (sess. 31. ch. 225.) declares, that no *person* or *persons,* without the license of those who are entitled to the exclusive right, &c. shall set in motion, or navigate upon the waters of this state, any boat moved by steam or fire. Would the construction be endured, that this prohibition extended only to individuals, and not to corporations ? If so, the act is but a flimsy protection to those claiming the exclusive right. But there is no colour for such a construction. Keeping in view, then, the restraining act, and applying the rules of construction I have mentioned, I am persuaded that we look in vain for banking powers in the act incorporating the *Utica Insurance Company.*

It becomes my duty, however, to notice, a little more par-
ticularly, the several parts of the act which have been relied
upon as conferring such powers.   The preamble is said to
contain some such intimation, because it declares, that this
company ought to be *liberally encouraged.*   This is certain-
ly a pretty forced extension of that expression, and not war-
ranted by any thing contained in the recital, which states,
that incorporating an *insurance company* which had been
formed in *Utica,* would tend to mitigate the calamities of
fire, give security to manufacturers, and confidence to those
who adventure their property on our vast navigable waters ;
that those are laudable objects, and that a company promo-
ting them ought to be liberally encourged.   But it is far fetch-
ed indeed, to suppose that the right of carrying on bank-
ing operations was intended or intimated by this liberal en-
couragement.   The second section which professes to enu-
merate and define the powers of the company, does not con-
tain an intimation that the right of banking is among such
powers, and it cannot grow out of the general clause which
authorizes them to transact all the business generally per-
formed by *insurance companies,* excepting certain specified
kinds of business therein particularly mentioned.   It was,
however, contended on the argument, that the right of car-
rying on banking operations was necessarily incident to the
corporation, because not expressly prohibited, if they had
surplus funds which they could spare for that purpose.   But
I cannot assent to this rule of construing a charter of incor-
poration for a *specific object.*   Such an incorporated company
have no rights except such as are specially granted, and those
that are necessary to carry into effect the powers so granted.
Many powers and capacities are tacitly annexed to a corpo-
ration duly created ;  but they are such only as are necessary
to carry into effect the purposes for which it was established.
The specification of certain powers operates as a restraint
to such objects only, and is an implied prohibition of the ex-
ercise of other and distinct powers.   A contrary doctrine
would be productive of mischievous consequences, especially
with us, where charter privileges have been so alarmingly
multiplied.

But it is said, that the 9th section of the act contains

ALBANY,
August, 1818.

THE PEOPLE
v.
UTICA INS. Co.

a direct grant of banking powers, not, indeed, *eo nomine,* but by necessary implication, because, it gives to the directors power to make such by-laws, rules, and regulations as they shall deem proper, touching the management of the stock, property, estate, effects, and concerns of the corporation, &c. and the investment of the funds of the corporation, which the business of insurance may not actively employ. Admitting that here is a power granted to invest their surplus funds in banking operations, were it not for the restraining act; yet, when we see that such a use of their surplus funds would be directly in the face of that act, we ought not to give such a construction to these words, unless no other sense or meaning can be attached to them, and their funds would be obliged to lie dead and unemployed. Besides, the proviso to this clause, which seems to have been overlooked, may very fairly admit of a construction amounting almost to an express prohibition, to employ such funds in banking business. It declares, that such *investment* shall not be repugnant to the *laws* of this state, nor forbidden by that act in the restrictions and prohibitions on this corporation, thereinafter mentioned. But an investment or employment of these surplus funds in banking business, if not authorized by law, would be against the restraining act, and so repugnant to a law of this state, and, therefore, coming directly within the prohibition contained within the proviso. But these surplus funds may be invested in many ways, besides in banking business, consistently with the provisions of this act, and not prohibited by any other law; and it is rather a forced use of the term *invest,* to apply it to an active capital employed in banking. It is usually applied to a more inactive and permanent disposition of funds. And although it might extend to banking, yet it ought not to receive that interpretation here, when another sense, more obvious, and consistent with the general object of the incorporation, may be given to it. One of the rules of construction alluded to may properly be applied here. That although a thing be within the letter of the statute, it is not within the statute, unless it be within the intention of the makers. The surplus funds may, no doubt, be loaned at interest. The second section of the act prohibits the loan-

ing for certain specified purposes, but the loaning for any
other purpose, and in any other way not prohibited by law,
is authorized and included in the general power to invest
the surplus capital; and under the 12th section, they have a
right to take and hold mortgages to secure such loans;
for this section expressly declares, they shall have the right
so to do, to secure the payment of any debt which may be-
come due to the corporation, by any means howsoever. A
bond or note given to the corporation on a loan of money,
creates a debt due to them, and the payment may be secured
by mortgage, by the express authority here conferred. There
is, then, we see, granted the right to *invest* the surplus funds in
a manner much more consistent with the ordinary understand-
ing of the term *investment*, than to employ them in banking
business. It would, therefore, be against every just rule of
construction, to give to this term the latter interpretation.

It is under the 15th and 16th sections, that the right to make
promissory negotiable notes is claimed; and admitting such
authority to be there given, it does not follow that banking
powers are also granted. Any company or association may
enter into an arrangement to transact their business in a
particular manner, and agree to be bound by any *engage-
ment*, made and signed by certain designated agents. This
would be binding on the company. It is not, however,
the mere power of making such notes, or the particular
manner in which they are made, that will confer banking
powers, under the restraining act. But it is a very strain-
ed construction of the term *engagement*, to suppose it
means a *bank note*. This is not the usual and ordinary
acceptation of the term. If any such thing had been
intended by the legislature, the more appropriate term
would, doubtless, have been employed. The word *en-
gagement*, as used in the act, may very fairly be consi-
dered as synonimous with policy. Yet a more enlarged
sense might be given it, and still limit it to contracts in and
about the business of insurance, and the transactions ex-
pressly authorized by the charter. The 5th section has
been supposed to contain, in some degree, words that help
out the construction contended for by the defendants. By
this section, the stockholders owning two thirds of the stock

may vote to discontinue the business of the corporation; and in such case, the directors are required to call in all parts of the funds, or capital stock of the corporation which may have been loaned, and all debts of any nature which may be due to the corporation. But nothing more is implied, or to be inferred from this authority or direction, than that the corporation may make loans and have debts due to them. It does not follow that such loans were made, or such debts created, in the course of banking operations. They may have debts owing to them as premiums, and otherwise; and it has been shown that they may also loan money. It would be a gross violation of the rules of construction, which I have noticed, to consider this as necessarily implying the right of entering at large into the business of banking.

I have, I believe, noticed all those parts of the act on which any reliance has been placed, to make out the authority claimed under it by the defendants. And I think I have shown, that there is no power or privilege conferred by this act, which may not be enjoyed, nor any one term or expression used, that may not be explained, and receive an appropriate meaning and application, without assuming that the right of carrying on banking operations is granted. I am accordingly of opinion that the defendants are unauthorized, by law, to enter into such business, and that judgment of ouster ought to be rendered against them.

SPENCER, J. Two questions have been brought forward in the argument:

1st. Whether an information in the nature of *quo warranto* will lie in this case?

2d. Whether the defendants have authority, under the act incorporating the *Utica Insurance Company*, to carry on banking operations in the manner set forth in their plea?

The statute (1 *N. R. L.* 108.) gives this writ against any person who shall usurp, intrude into, or unlawfully hold and execute any office, or franchise within this state; and if the right set up by the defendants is a franchise, and the act un-

der which they claim to exercise it, does not confer it, then the defendants are subject to this prosecution.

A franchise is a species of incorporeal hereditament; it is defined by *Finch* (164.) to be a royal privilege, or a branch of the king's prerogative subsisting in the hands of a subject; and he says, that franchises being derived from the crown, they must arise from the king's grant, or, in some cases, may be held by prescription, which presupposes a grant; that the kinds are various, and almost infinite, and they may be vested in natural persons, or in bodies politic.

All the elementary writers agree in adopting *Finch's* definition of a franchise, that it is a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject. ·

An information, in the nature of a writ of *quo warranto*, is a substitute for that ancient writ which has fallen into disuse; and the information which has superseded the old writ is defined to be a criminal method of prosecution, as well to punish the usurper, by a fine for the usurpation of the franchise, as to oust him and seize it for the crown. . It has, for a long time, been applied to the mere purpose of trying the civil right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal only. (2 *Inst.* 281. pl. 12. 3 *Burr.* 1817. 4 *Term. Rep.* 381. 1 *Bulst.* 55.)

If there are certain immunities and privileges in which the public have an interest, as contradistinguished from private rights, and which cannot be exercised without authority derived from the sovereign power, it would seem to me that such immunities and privileges must be franchises; and the act for rendering the proceedings upon writs of *mandamus*, and informations in the nature of *quo warranto*, more speedy and effectual, presupposes that there are franchises, other than offices, which may be usurped and intruded into. If, in *England*, a privilege in the hands of a subject which the king alone can grant, would be a franchise, with us a privilege, or immunity of a public nature, which cannot legally be exercised without legislative grant, would be a franchise. The act, commonly called the restraining law, (sess. 27. ch. 114.,) enacts, that no person *unauthorized by law,*

shall subscribe to, or become a member of any association, or proprietor of any bank or fund, for the purpose of issuing notes, receiving deposits, making discounts, or transacting any other business which incorporated banks do, or may transact, by virtue of their respective acts of incorporation.

Taking it for granted, at present, for the purpose of considering whether the remedy adopted is appropriate, that the defendants have exercised the right of banking, without authority, and against the provisions of the restraining act, they have usurped a right which the legislature have enacted should only be enjoyed and exercised by authority derived from them. The right of banking, since the restraining act, is a privilege or immunity subsisting in the hands of citizens, by grant of the legislature. The exercise of the right of banking, then, with us, is the assertion of a grant from the legislature to exercise that privilege, and, consequently, it is the usurpation of a franchise, unless it can be shown that the privilege has been granted by the legislature. An information, in the nature of a writ of *quo warranto*, need not show a title in the people to have the particular franchise exercised, but calls on the intruder to show by what authority he claims it; and if the title set up be incomplete, the people are entitled to judgment. (2 *Kyd on Corp.* 399. 4 *Burr.* 2146, 7.)

This position is illustrated by the nature and form of the information; the title of the king is never set forth; but after stating the franchise usurped, the defendant is called upon to show his warrant for exercising it.

This consideration answers the argument urged by the defendant's council, that banking was not a royal franchise in *England*, and that it is not a franchise here which the people, in their political capacity, can enjoy; for if their title to enjoy it need not be set out in the information, it is not necessary that it should exist in them at all. In the case of *The King* v. *Nicholson* and others, (1 *Str.* 303.) it appeared that by a private act of parliament for enlarging and regulating the port of *Whitehaven*, several persons were appointed trustees, and a power was given to them to elect others upon vacancies by death or otherwise. The defendants took upon them to act as trustees without such an election; and

upon motion for an information in the nature of a *quo warranto* against them, it was objected, by the counsel for the defendants, that the court never grants these informations but in cases where there is a usurpation upon some franchise of the crown ; whereas in that case the king alone could not grant such powers as are exercised by the trustees, the consequence of which was, that this authority was no prior franchise of the crown. To this it was answered, and resolved by the court, that the rule was laid down too general, for that informations had been constantly granted when any new jurisdiction or public trust was exercised without authority ; and leave to file an information was, accordingly, granted. This case is a strong authority in favour of this proceeding.

Many cases might be cited in which informations, in the nature of *quo warranto*, have been refused where the right exercised was one of a private nature, to the injury only of some individual. In the present case, the right claimed by the defendants is in the nature of a public trust ; they claim, as a corporation, the right of issuing notes, discounting notes, and receiving deposits. The notes they issue, if their claim be well founded, are not obligatory on the individuals who compose the direction, or are proprietors of the stock of the corporation. These notes pass currently, on the ground that the corporation have authority to issue them, and that they are obligatory on all their funds ; the right claimed is one, therefore, of a public nature, and, as I conceive, deeply interesting to the community ; and if the defendants cannot exercise these rights without a grant from the legislature ; if they do exercise them as though they had a grant, they are, in my judgment, usurping an authority and privilege of a public kind ; and, we perceive, that it is not necessary that the right assumed should be a a prior franchise of the crown, or of the people of the state.

Had the defendants claimed and exercised the right of banking as private individuals. I agree that an information would not lie against them ; they would have been subject only to the penalties inflicted by the act ; but they claim the privilege as a corporation, and under a grant from the legislature. If they have not that grant, they have exercised

and usurped a franchise, and the remedy persued is well, adapted to the case.

This brings me to the second question.

The *Utica Insurance Company* was incorporated on the 29th of *March*, 1816 ; and it is contended on the one hand, and strenuously denied on the other, that the act gives to the corporation the power of banking.

· The preamble to the act has been resorted to, to show the object of the incorporation and the intention of the legislature, and both parties draw conclusions favourable to their positions from it. The true rule on this subject undoubtedly is, that the preamble of an act cannot control the clear and positive words of the enacting part, but may explain them, if ambiguous. The preamble in question, it seems to me, cannot be called in to aid the construction of the enacting clauses ; for, although it shows that the object of the incorporation was to insure against losses by fire, and the navigation on the waters of the interior, and declares these objects to be laudable, yet it adds, " that a company promoting them in the interior of our country where the profits must necessarily be small, ought to be liberally encouraged." What that encouragement was to be, whether in matters of insurance, strictly, or whether in the grant of additional powers and rights, must be matter of mere conjecture. I must, therefore, read the act as if it were without a preamble, in reference to the points now in question.

The principal attributes of a bank are the right to issue negotiable notes, discount notes, and receive deposits. Have the defendants a right to issue negotiable notes without reference to their right to insure ?

The second section of the act forbids their issuing any notes which grant, or stipulate to pay, annuities upon any life or lives ; the fifteenth section provides, that any policy *or engagement*, signed by the president, and attested by the secretary, when done conformably to any by-laws of the directors, shall be valid against, and effectually bind the said corporation, without the presence of a board of directors, and as effectually as if under the seal of the corporation. The 16th section enacts, that no policies *or engagements* whatever, which shall be entered into by the corporation

with any individual, body politic, or corporate, shall be trans-

ferable, negotiable, or assignable, so as to give such second
holder or assignee, a claim on the corporation, either in his
own name, or in the name of the person originally con-
cerned, unless the consent of the corporation shall have
been previously obtained, and endorsed in writing on such
instrument, or unless such a privilege form a part of the ori-
ginal agreement, and be expressly granted by the corpora-
tion.   The 18th section prohibits the issuing of any notes,
as therein before prohibited.

I cannot bring myself to doubt, for a moment, that the
right of issuing negotiable notes, except in the prohibited
case, of notes stipulating to pay annuities upon lives, is
given with entire latitude, depending on the discretion and
will of the corporation.   The grant of the power is unli-
mited and unrestricted.   The prohibition not to issue any
notes stipulating to pay annuities upon any life or lives, ta-
ken in connection with the general grant of power to issue
negociable engagements without restraint, shows that the
legislature intended that there should be no restraint or pro-
hibition but in the specified case. And upon the settled prin-
ciple of construction, an exception to a power otherwise un-
limited, shows that it was intended to be limited no farther
than is expressed in the exception.

It is contended, that the power to issue engagements,
contained in the 15th and 16th sections of the act, must be
confined to such as may become necessary in the principal
business and objects of the incorporation, that is, upon sub-
jects of insurance, and where losses happen, which it is not
convenient for the corporation to pay immediately.   This
argument supposes that all the powers conferred by the act
embrace the business of insurance ; and that idea is only to
be collected from a part of the preamble, rejecting or over-
looking that part of it which declares, that a company pro-
moting the objects before enumerated, where the profits
must necessarily be small, should be liberally encouraged.

The liberal encouragement, it would seem to me, meant
some benefits beyond the small profits arising from insurance
against fire and of the navigation on our interior waters.   I
have already said, that I lay no stress on the preamble, and

ALBANY,
August, 1818.

THE PEOPLE
v.
UTICA INS. Co.

all I contend for is, that if it be called in to aid the construc.-tion of the act, it must be taken altogether.

Have the corporation a right to discount notes? The discounting of notes is one mode only of lending money, and that they possess this power, appears to me indisputable. By the ninth section of the act, the directors have express power to call and demand from the stockholders the remainder of all sums by them subscribed, and adequate power is given to enforce the payment; in the same section, the directors are authorized to make and pursue such by-laws, rules, and regulations, as they shall deem proper, and among other things, for the *investment of the funds of the corporation which the business of insurance may not actively employ.*

I know of no technical legal definition of the term *investment*, as applied to money. In common parlance, it means the putting out of money on interest, and, beyond all doubt, the legislature meant that the corporation might put out, or use and employ such part of their funds as the business of insurance did not actively employ; and the plea put in by the defendants alleges that their discounting of notes consists in investing the funds of the corporation, which the business of insurance in the act mentioned did not actively employ, and no otherwise. If the mode of investment, by discounting notes, which is nothing else than lending money on personal security, is not prohibited by the act of incorporation, then it appears to me to be authorized under the general and unqualified power of investing the funds not actively employed in the business of insurance.

This idea derives confirmation from the fifth section of the act, which, after authorizing the stockholders owning two-thirds of the stock to discontinue the business of the corporation, makes it the duty of the directors to call in all parts of the funds or capital stock of the corporation *which may have been loaned by the corporation.* The second section of the act forbids their loaning upon bottomry and re-spondentia; and, as I read the 12th section of the act, the power conferred on the corporation to take and hold mort-gages extends only to the taking them when given to secure the payment of the shares subscribed, or to secure the pay-ment of money which, in the course of business, actually be-

comes due to the corporation. The 18th section of the
act forbids the employment of any part of their funds in
buying or selling goods and merchandize, or any funded or
other stock, created by act of congress, or of any particular
state ; or in buying or selling the stock of any bank, or in
loaning any money, or issuing any notes, as therein before
prohibited.

It would seem to follow, as a necessary consequence from
the general provision, that the corporation might invest
such of their funds as the business of insurance might not
actively employ, and the denial of the means of investment,
unless by lending money on personal security, that such
lending is authorized. But the prohibition in the 18th sec-
tion to the loaning any money, as therein before prohibited,
by necessary inference authorizes the loaning in any case
not within the prohibition ; and, consequently, the discount-
ing of notes not being prohibited before, is authorized.

It has been argued, that the proviso to the 9th section of
the act operates to prohibit the discounting of notes by the
corporation, in as much as discounting notes by the defend-
ants is prohibited by the restraining act. The proviso is,
" that such investment, by-laws, rules, and regulations,
shall not be repugnant to the constitution and laws of this
state, or of the *United States*, nor forbidden by this act in
the restrictions and prohibitions on this corporation herein-
after contained." The restraining act provides that no per-
son *unauthorized by law shall subscribe to, or become a mem-
ber of any association, or proprietor of any bank or fund,* for
the purpose of issuing notes, receiving deposits, making dis-
counts, or transacting any other business, which incorpo-
rated banks do, or may transact, by virtue of their respective
acts of incorporation.

The offence prohibited by this act, consists in subscrib-
ing to, or becoming a member of any association, or propri-
etor with others of any bank or fund unauthorized by law
for banking purposes. But if the subscribing to, or becom-
ing a member, or a co-proprietor of any fund, is authorized
by law, then the issuing notes, receiving deposits, and
making discounts, is no violation of the act. The act
guards against two things ; the unauthorized institution

ALBANY,
August, 1818.

THE PEOPLE
v.
UTICA INS. Co.

of a fund or bank by an association of individuals, and the making use of that fund for banking purposes. To subject a corporation or individuals to the operation of the act, and to convict them of an offence against it, both circumstances must concur. The fund must be unauthorized, and it must be for the purposes of banking. The statute considers the association by individuals to create, and actually creating, a fund or bank, the principal offence ; the purpose for which it is done, if it be in contravention of the act, completes the offence. How, then, can it be said, that this corporation have violated the restraining act, by investing that part of their capital which the business of insurance may not actively employ, when the act of incorporation expressly authorizes a subscription to the stock of the corporation, limits the number of shares to two thousand, and fixes them at two hundred and fifty dollars each, and empowers the directors to call it in ? If the simple act of loaning money by a corporation legally possessed of a fund, by way of investing their surplus capital, is not an offence against the restraining act, (and I say, with entire confidence, that it is not) there is an end of the question, for there is no other law which it is pretended has been violated.

The same answer is applicable to the objection against this corporation receiving deposits ; there is no express authority in the act of incorporation to receive deposits, as there is to issue negotiable notes, and to loan money ; but the act of receiving money as a bailee or trustee for another, is an innocent and harmless act, forbidden by no law, and injurious to no person.

I have, then, examined the act incorporating the defendants, and the restraining act, and if I have taken a correct view of the powers conferred by the former, and have given a just construction to the latter, the defendants stand unaffected by it.

I have totally disregarded all insinuations or suggestions that the legislature, in point of fact, did not intend to grant banking powers. I know of no other rule by which to construe a statute, than to examine it by the words it contains, to give to its expressions a fair and just interpretation, upon the established rules of construction. Courts of law can-

not consider the motives which may have influenced the legislature, or their intentions, any further than they are manifested by the statute itself. It is true, that this act of incorporation grants no express power of banking, *eo nomine ;* nor is it necessary to authorize banking operations, that any particular form of expression should be used ; it is sufficient if the attributes of banking are conferred.

In considering this case, my opinion does not rest on any implied powers which the corporation possess, merely as a corporation ; but is founded on the powers expressly given, and on such as are necessarily implied from the language of the act of incorporation. And, in my judgment, the defendants have a very clear title to enjoy the franchise set forth in their plea.

PLATT, J. being related to some of the defendants, declined giving any opinion.

Judgment of Ouster.