Gaston, Judge,
 

 after stating the case as above, proceeded: The act in relation to appeals, enacts that when an appeal shall be allowed from an interlocutory judgment, the Judge allowing the appeal shall and may direct so much only of the records and proceedings in the cause to be certified to the Supreme Court as he shall think necessary to present the question or matter, arising upon such appeal fully to be considered by the said Court. No such direction has been given in this case, and we have no means of ascertaining the question or matter referred to us, further than that it arises on an appeal from the judgment over-ruling the respondent’s second plea, and sustaining the demurrer thereto. The
 
 direct
 
 question, therefore, presented for our consideration is, the sufficiency of that plea. However
 
 informal
 
 this may be, it is in
 
 substance
 
 a plea by way of estoppel, that the State is concluded to allege that the respondent was not seized of a freehold of 100 acres in fee, at the time of his election, because that matter hath been determined by the adjudication of the County Court of Rowan.
 

 Waiving all formal objections to this plea, it' is bad in substance. Judgments operate by way of estoppel against all the world, when they are judgments
 
 in rem
 
 — that is to say, pronounced by a court exercising that peculiar jurisdic
 
 *46
 
 diction which authorises it to decide on a
 
 subject matter
 
 independently of
 
 parties.
 
 And they operate as estoppels between parties, to prevent further litigation in relation to & su{jject matter which has been directly and solemnly decided in a suit properly constituted between them. Now, in regard to the alleged adjudication of the County Court of Rowan, upon what ground can it be alleged to be a judgment
 
 in rem,
 
 binding all the world? There ought to be a very unequivocal grant of this
 
 high
 
 power to
 
 that
 
 Court, before it can be assumed. Where is the evidence of this grant found? In the statute regulating the election of sheriffs, after prescribing by whom they shall be chosen, when and where the votes shall be received, how and where the returns of the votes received shall be made to the County Courts, it is declared, “ and the County Courts, a majority of the Justices being present, shall be a competent tribunal to decide all contested elections under this act.” Here is the whole of their authority to
 
 decide
 
 “contested elections.”— Between whom is such decision to be made? Manifestly between the
 
 parlies contesting.
 
 It is an adjudication as far as it goes
 
 inter
 
 partes, and is therefore binding on none except the parties, or those who come in by privity under them. But it has been argued that the right of the matter in contest, may involve the necessity of determining on the qualifications of the person apparently -elected, because, if he have not the necessary qualifications, the votes cast on him are thrown away. Without stopping to enquire whether this doctrine, the same which was so much agitated in Wilkes's case, be in any respect true with us, and, if so, to what extent, it is a sufficient answer to the argument inferred from it, that whatever the adjudication
 
 be
 
 — or on whatever founded — it decides nothing, except between the parties to the suit or contest. Public policy may require of parties who have once had a full and fair opportunity of asserting their respective claims before a competent tribunal, and who have obtained a solemn decision thereon, and of the repretatives of those parties, not to agitate the repose of society by further litigation upon the same subject matter; but it would violate the first principles of justice, if any one not a party
 
 *47
 
 to that contest, and who could not interfere therein, should be precluded from shewing forth his rights because of matter therein determined.
 

 It is insisted, nevertheless, on the part of the appellant, that it the plea in question be bad in substance, nevertheless the judgment on the demurrer is erroneous, because the information is altogether illegal, or if legal, is wholly insufficient. It may be doubted whether these grave enquiries are fit to be considered now, when the question before us is on the interlocutory judgment overruling the plea. But as they have been argued on both sides, and been fully considered, and as our minds are quite made up upon them, we have no hesitation in declaring our opinion.
 

 ■ It is objected, in the first place, that an information of the kind before us, is utterly prohibited by the 8th section of our Bill of Rights, which declares that “ no freeman shall be put to answer any criminal charge but by indictment, presentment or impeachment.” The enquiry is, whether the information in question be, within the meaning of the Bill of Rights, a “ criminal charge”? In every well regulated government there must be some mode by which to put down the usurpation by unauthorised individuals of public power. In the country of our ancestors, and in ancient times, when any of the offices or franchises appertaining to sovereignty, and therefore called royal, were supposed to be held or exercised without lawful authority, the remedy was by suing out the writ of
 
 Quo
 
 Warranto, to enquire by what warrant the supposed usurper supported his claim, in order to determine the right thereto. This was said to be in the nature of a writ of right for the King, and from what we have seen of the pleadings in it, bore little or no resemblance to a criminal prosecution. See Rustell’s entries
 
 Quo Warranto.
 
 Indeed Mr. Justice Wilmot, in
 
 Rex
 
 v. Marsden, 3 Bur. 1817, declares positively that it is not a criminal prosecution, but a civil writ at the suit of the crown, though Chancellor Kent, in the
 
 People
 
 v.
 
 Utica Insurance Co., 2
 
 Johns, cases in Ch’y. 117, speaks of it as a criminal proceeding. Be this as it may, the remedy certainly much resembled, if in truth it were not a real action; and, like other actions of that family,
 
 *48
 
 Was subjected in its prosecution to inconvenient delays. On this account, like most real actions, in process of time it became much disused, and its place was supplied by the in-format¡on in the nature of a
 
 Quo Warranto.
 
 Originally
 
 this
 
 was a criminal proceeding. In it the usurpation was charged as an offence, and the offender, upon conviction, was liable to be punished by fine and imprisonment. Such, however, were the conveniences attending the information, as a mode of trying the mere question of right to the office or franchise, that although it never entirely lost its form as a criminal proceeding, it was so modelled as to become substantially a civil action. . A fine, indeed, was imposed upon conviction; but it was nominal only. — no real
 
 punishment
 
 was inflicted — and it became, before our revolution, the general civil remedy for asserting and trying the right, in order to seize the office or franchise, or to oust the wrongful possessor. See 3 Blk. Com.
 
 262-3
 
 —Rex v. Francis, 2 Term,
 
 484
 
 —Commonwealth v.
 
 Brown,
 
 1 Serg. & Raw. 385—
 
 People
 
 v.
 
 Utica Insurance Co.,
 
 15 Johns. 386.
 

 Besides this peculiar information, well known as
 
 “the
 
 information in nature of a
 
 Quo
 
 Warranto,” there was a mode of prosecution for the punishment of crimes by “ information.” This was, by a suggestion or charge, drawn up in form, and filed on record by the King’s Attorney General, or by his Coroner or Master of the Crown Office, in the Court of King’s Bench; and was deemed sufficient in every case not capital, to call every man to answer for the offence therein charged. There could be no doubt but this mode of criminal prosecution was as ancient as the common law itself, but the tyrannous use made of it in high prerogative times, especially after jurisdiction of criminal prosecutions by information was extended to other tribunals than the Court of King’s Bench, justly subjected it to the reprobation of the friends to freedom. The framers of our Bill of Rights were not school men dealing in metaphysical abstractions, and busied about technical forms, but practical statesmen guarding against real abuses of power, and securing
 
 the
 
 substantial rights of freemen. They intended to prohibit this mode of prosecution for crimes, and to throw around the ob
 
 *49
 
 ject of penal visitation the protection either of a grand jury, or of an enquiry by the impeaching body — before he could be required to plead to a criminal accusation. Such is the purpose of the 8th section of the Bill of Rights; and accordingly, we find it connected with a number of provisions from the 7th to the 10th inclusively, in which are embodied the securities for a fair hearing, full defence, impartial trial, and the administration of justice in mercy to all sought to be convicted and punished because of public offences. The proceeding before us is carried on
 
 diverso intuitu,
 
 and to hold it prohibited by the Bill of Rights, would be to sacrifice substance to mere form. If, indeed, it should ever be attempted in informations of this character to impose a real fine, or to inflict any other punishment, so as to make them in effect criminal prosecutions, such attempts would fall before the explicit prohibitions of the section of the Bill of Rights now needlessly invoked.
 

 In the next place, it is objected that the present information purports to be framed in conformity to the provisions of our act of 1836,
 
 “
 
 concerning writs of
 
 Quo Warranto
 
 and
 
 Mandamus,”
 
 (1 Rev. Stat. ch. 97;) but on a fair examination of that act, it will be found not to warrant this proceeding. It is admitted that the
 
 words
 
 of the act are sufficiently broad to take in the case, for they declare it lawful for the Attorney General or Solicitors of the State, where any person shall hold or execute any office or franchise unlawfully, to exhibit, with the leave of the court, an information in the nature of a
 
 Quo Warranto,
 
 at the relation of any person desiring to prosecute the same. But it is argued, these words must be taken with some qualification. The act has been modelled after the English Statute of 9lh Anne, which, in terms, is confined to informations respecting the disputed offices and franchises of boroughs and corporations; and although this act cannot be so restricted, yet (it is said) many of its provisions shew that the Legislature had in view contests between different claimants to offices and franchises, and its enactments ought to be understood with reference to contests of this description only.. Here, it is not shewn what interest or claim the relator, Henry Giles, had in or to the
 
 *50
 
 subject matter of this controversy, and it cannot be intended ^lai; Legislature meant that he, or any other officious stranger, might, under the cover of this act, and in the guise a ,reiatorj cap on any officer of the State, Governor, Judge or Sheriff, to shew the warrant for his public acts, in order to spy out, if possible, some defect of title.
 

 We have before had occasion to say (see
 
 State
 
 v.
 
 King,
 
 decided at this term) that there are
 
 some
 
 provisions in this act as to proceedings by
 
 mandamus,
 
 which must be regarded as applicable only to contests between individuals. But we cannot yield to the argument that the enactments of the statute were not meant to apply to any other. The purpose of the Legislature, we have no doubt, was as broad and comprehensive as the terms of the act indicate: that is to say, to regulate the mode by which all usurpations of offices and franchises might be examined and determined in the Courts of Justice, “asis usual in cases of information in the nature of a
 
 Quo Warranto”
 
 Such informations lay, at common law, independently of any statute, for intrusion into any office affecting the public, or for the exercise of a franchise of what was termed a regal character. Buller’s Nisi Prius. 211.
 
 The King
 
 v.
 
 Highmore,
 
 5 Barn. & Ald. 771. Corn’s
 
 Quo Warranto,
 
 A B. The object of the statute of Anne was to regulate the proceedings thereon in certain cases relating to corporations, and our Legislature followed that statute as a fit model for regulating the proceedings on informations
 
 generally.
 
 There can be no serious danger, that, under our act, the public repose will be capriciously disturbed, since no information under it will lie, but with leave of the court, and then must be prosecuted by the proper law officer of the State upon his official responsibility. Whether in this case, it was necessary that any relator should be named, we stop not to enquire. For whether he be named or not, the information is that of the solicitor of the State; and we hold it to be clear, that under our act “concerning the Attorney Gen_ eral and Solicitors for the State,” each Solicitor, within his respective circuit, holds in all pleas of the State the same authority which the Attorney General may exercise therein, within
 
 Ms
 
 circuit. There is nothing in the nature of the
 
 *51
 
 office here claimed, which should exempt usurpations of it from the mode of legal examination and trial provided by this act. See
 
 People
 
 v.
 
 Van
 
 Slick, 4 Cow. 323.
 
 Commonwealth v
 
 .
 
 Fowler,
 
 10 Mass 295.
 

 Other objections have been made to the mode of proceeding, but they do not appear to us well founded. It has been objected that it does not appear that this information was filed by leave of the court. Without admitting that it is necessary that this fact should appear affirmatively, we hold, that in this case, the explicit sanction by the court of the information of the Solicitor, as declared of record, shews that it was filed with the leave of the court.
 

 It has also been objected that the full title of the i£ Solicit- or jfor
 
 the State
 
 is not set forth in the information, but he is termed “ Solicitor” only. The court knows, judicicially, who is the Solicitor for the State in that circuit; and we presume. it had no difficulty, and we can have none,? in understanding that it was in
 
 this
 
 official character the information was filed. If there be any thing in the objection, it is formal only, and cannot avail the respondent, on a demurrer to his plea.
 

 We see no sufficient cause to disapprove the judgment from which the respondent has appealed to this court. This opinion must be certified to the Superior Court of Rowan, that the said court may proceed in the matter before it accordingly.
 

 Per Curiam. Judgment affirmed,.