Harper, Chancellor.
Certainly I cannot suppose it necessary seriously to argue that a charter of incorporation may be forfeited, if the corporation fails to accomplish the purposes for which it was created; a principle recognized and affirmed by every one of the numerous decisions and authorities in which the subject has been treated; which has not been questioned for more than a century; and which is asserted by the judgment which is now under consideration ; that, according to the authorities quoted in argument, “franchises may be forfeited by breach of the trusts upon which they were granted, and perversion of the end of their grant or institution;” “that a corporation may be forfeited, if the trust upon which it was created be broken, and the institution perverted;” “that a corporation may be dissolved by misuser or abuser; for, as all franchises flow from the bounty of the crown, so there is a tacit or implied condition annexed to such grants, which, if broken, forfeits the whole franchise;” “ that a corporation may be dissolved by forfeiture of its charter, through negligence, or abuse of its franchises; in which case, the law judges that the body politic has broken the condition upon which it was incorporated, and that the incorporation is void ;” “ and that suffering one act to be done, which destroys the end and object for which the corporation was instituted, must be regarded as equivalent to a direct surrender.”
Then what are the purposes for which banks are created ! There is no doubt but that, according to the authority quoted — “ the power to issue notes, make discounts, and receive deposits, would follow from the mere grant of a charter of incorporation as a bank. These constitute the *501 ordinary banking powers, and are incidental to every grant of a bank charter, unless expressly excluded.” 2 Cowen, 711 ; 15 Johns. 393. That the - corporation is to exercise these functions, is included in the meaning of the word bank, as universally understood in this country. Such charter would equally import that, at least generally, the bank should pay its notes and deposits in gold or silver when demanded; and all this would be as perfectly understood by every individual of ordinary intelligence, as if the law had declared in the most explicit terms, “ that it shall be the duty of such bank to lend money ; redeem its notes, when demanded, in gold and silver; receive deposits, and in like manner repay them when demanded.” No one has conceived of a bank which was not to make discounts; ■which was not to issue its notes — or if we suppose this left to its discretion and sense of interest, as being the main source of its profits — which, if issued, was not to redeem them when demanded; which was not to receive deposits, or receiving them, not to repay them on demand.
But, indeed, the charter of 1832, under which the defendants claim, after granting them the franchise of being a corporation for twenty-one years, does, by reference to the former charter, and the charters of other banks, and in connexion with the Act of 1816, in fact, confer upon the Bank of South-Carolina, as alleged in the sciere facias, the powers, “for and during the said term, to issue promissory notes and bills of credit in the nature of a circulating medium, not being of a lower denomination than five dollars, and payable on demand, when due, in gold and silver, legal current coin of the said State; to receive and hold moneys on deposit; to make loans of money, and discount promissory notes at a rate of interest not exceeding six per centum per annum; to deal and trade in bills of exchange, <fec.” Certainly it can make no difference that the form of the Act is that of a grant of powers. The grant expresses the purposes for which they were created, and it is by the exercise of these powers, that they must fulfil the purposes of their creation. It is no less binding on them, than if such were declared to be their duties. Then, if they are bound to exercise these functions, according to the authorities, these are implied to be the conditions of their continu *502 ed existence. If there were such express conditions in the charter, no one would doubt but that by accepting the charter, they entered into a contract for the performance of those conditions. It can make no difference, that, according to unquestioned authority, they are implied by law. There is no hardship in this, for they are as perfectly understood as if they were expressed.
I agree with the Attorney General, that until the cases of Terrett vs. Taylor, and Dartmouth College vs. Woodward, the distinction of public and private corporations, as understood for the purposes of these decisions, had not been generally recognized by the English cases. The general distinction of every corporation, by the English law, is that of civil, and eleemosynary. 1 Bl. Com. 270. And when Lord Holt, in Philips vs. Bury, says that there are two sorts of corporations, one for public government, the other for the administration of private charity — that public corporations are not subject to a founder, but to the general law; but that those for private charity are subject to the exclusive control of the founder, or visitor, who represents him — he indirectly refers to the same distinction that Biackstone has done. Yet in the Attorney General vs. Pierce, 2 Atk. 87, it is said that it is the extensiveness of the objects which constitutes a public charity; and that when the objects are to be selected by trustees, this makes it a public charity. The distinction laid down in Terrett vs. Taylor, and Dartmouth College vs. Woodward, has been recognized and followed, probably, in every State of the Union; no part of the law is more familiar, and perhaps those decisions are not now to be questioned.
But when the question is, whether the Legislature has power to modify or repeal a charter, undoubtedly we are to inquire whether it is, or is not, a contract. And as, undoubtedly, this depends on the result of an inquiry whether it is or is not founded on a consideration, it is hardly necessary to say, that without á consideration, there can be no contract. The decisions in the cases I have referred to, determine that in the instance of the civil corporations enumerated, cities, villages, (fee., the mere exercise of the functions or privileges conferred, can be no consideration *503 for the grant of those functions Ur privileges. These charters, therefore, are not contracts.
Undoubtedly there may be civil corporations without contract. Take the instance of the President and Directors of the Bank of the State, the capital of which is exclusively owned by the State. They, certainly, are merely the agents of the State for the management of its funds, and the State may dispose of its funds and discharge its agents whenever it thinks proper. So of the Trustees of the South-Carolina College, exclusively endowed and supported by the State. The Commissioners of the Roads and the Commissioners of the Poor, in the several districts, are corporations. Yet, evidently; they are the mere agents of the Legislature for the purposes of government. Their creation is not the grant of a franchise, but the imposition of a public duty. Many similar instances might be enumerated.
But when on the faith of a charter an individual endows a college, a church, or a hospital, he pays- a money consideration for the franchises conferred, and it would be against faith that these should be resumed at pleasure. It is immaterial whether a consideration be of benefit to one party, or of detriment or expense to the other. So in the instances of charters to a turnpike, rail-road, or bridge company, the members pay their money on the faith that they shall have the benefit of the exclusive privileges conferred during the stipulated time. So of a manufacturing company. When the charter of a ferry is granted, there is an implied undertaking on the part of the grantee, perfectly well understood, that he will provide the means of transportation, will transport passengers with their goods, and will be, to a certain extent, an insurer of the goods transported. These stipulations for the public service and benefit, on his part, form the consideration which renders the grant of the franchise a contract on the other part. It is a continuing contract, and if he should fail to any material extent in performing his part of it, this would authorize the other party to put an end to it, by a proceeding similar to the present.
Now, the present defendants claim to be.exempted from the ordinary control of the Legislature, to modify or revoke *504 their charter at its pleasure, ou no other ground than that their charter is a contract. But if they are not bound to-the performance of the functions and duties, for the public benefit, before specified, there is absolutely no consideration whatever for the grant to them, and their franchises may be resumed at pleasure. So the defendants set up a contract by which only one party is bound. But if there is any thing to which they are bound, I suppose it will be conceded that it is to redeem their notes and pay their deposits, when demanded, in gold and silver, at least, as I have said, in general. If there is any thing which would defeat the purposes of their institution, and prove injurious to the public, it would be the unnecessary, general, and habitual refusal so to redeem. It is agreed on all hands, that a charter may be forfeited, by non-user. But can we conceive a forfeiture for failing to do that which the corporation was under no obligation to do ? Certainly, there must be some refusal to redeem in specie, which would be cause of forfeiture. If, for no cause assigned, a bank should suspend specie payments for years, until its notes had depreciated fifty per cent, or more, (which has often occurred in the United States,) or if, after putting a large quantity of its notes into circulation, it should declare its intention to redeem none of them during its corporate term; and should act accordingly, could any one doubt, but that this was a defeating of the purpose of its creation?
I have said that in general ahank is bound to pay in specie, and that a general refusal to do so, is a cause of forfeiture. This implies that there may be particular refusals, which are not so; and I have no doubt but that such is the case. If one of its debtors should present a large amount of its notes, it might refuse to pay them, and claim to set off its own demand against them. So if it should refuse to pay a note suspected of being counterfeit, or should capriciously refuse to pay several of its notes. This would need no justification, but under the general issue pleaded, it would appear that this was no general refusal to redeem, defeating the purposes of its institution, and within the meaning of the law.
A bank is not said to refuse payment because it does not pay at five o’clock in the afternoon, or on Sundays, or holi *505 days. So, if in a Catholic country it were usual to suspend business during Lent, a banker would not be said to refuse payment, who should shut up his banking-house during that season. The thing must be judged of according to the habits of the country and the exigency of circumstances. Thus, in the instances supposed in argument, of a hostile invasion compelling the officers to remove with the funds and effects of the bank, or of the sickness of officers, or the burning of the banking-house, compelling them to suspend business for a time; nay, even, perhaps, in a case of a sudden run, if they should close their doors, for a short time, or of necessity refuse to pay, till they could collect their resources, it might be said that these were not refusals to pay within the meaning of the law; there was no general or wilful refusal.
But in the instances last referred to, there is supposed a total suspension of all the business of the bank, which indicates an important difference from the case before us. If after the retirement of the enemy, or the recovery of the officers, after a reasonable time for procuring another house, or of collecting their resources, had elapsed, the banks still continued the suspension of their business, they might be proceeded against for non user; although, perhaps, aresumption before proceedings instituted, might be held to cure the default. But when refusing to pay specie they continue to transact all other business, it cannot be said that they are guilty of non-user; though they enjoy all, and more than all, the legitimate advantages of their contract, without being subject to its burdens or performing its duties. In such case, there is no refusal to pay on demand, for no demand can be made. The ferryman may forfeit his charter by non-user, if he fails to perform his part of the contract. If he should refuse to transport one or several passengers, on account of high water, or capriciously, that could not be termed a non-user, though he might be liable to the individual injured. But if he should give public notice of his intention to suspend the transportation of any passengers, and should accordingly refuse to do so for nine months, he could hardly defend himself in a court, by showing that there was an excessive emigration, injurious to the State, and that he acted from the nraise *506 worthy motive of checking it. In this case, the defendants, according to the pleadings, did refuse to pay any of their notes or deposits in gold or silver for the space of nine months. They did this in pursuance of a resolution, deliberately adopted and published to the world; and apart from the pleadings, their notes must have of course depreciated in some degree, as compared with gold and silver, which the laws have made the measure of value. If this be not at least a, prima facie refusal to pay on demand, within the meaning of the law, defeating the purposes of the bank’s institution, and requiring to be justified or excused, it is plain there can be no such thing. It is general, and toilful. No other assignable limit can be fixed, which would not equally include the cases before supposed, of a suspension for years, until notes should have depreciated half their value, or a general refusal to pay during the corporate existence.
But it might be said that such extremity of abuse would be evidence of fraud. Indeed -it has been the principal argument throughout, that to induce a forfeiture there must be a fraudulent abuse, or such gross negligence as shall be evidence of fraud ; that there must be some malfeasance, or corrupt motive. Actions are either lawful, or unlawful. Of unlawful acts, some are fraudulent, and there are others which are not so regarded. I know of no intermediate class of actions, of equivocal generation, which are characterized as acts of malfeasance, or (if that be regarded as any thing else than fraudulent,) mala fide, or marked by a corrupt purpose. '' f course, I do not allude to acts of violence or crime, which may be called acts of malfeasance.
I would, in the first place, observe, that there might be instances of the extreme abuses which I have supposed, in which it would be impossible to establish the actual or moral fraud — and the law knows no other — nay, in which it would not exist. There is not, in reference to this subject, any artificial rule — as in the case of a person indebted, who afterwards proves insolvent, making a conveyance of his property — by which the fraudulent motive is to be inferred from certain appearances. You must establish the actual fraudulent motive. But I can well conceive, that without the gross neglect which would be evidence of such *507 motive, there might be a very long and unnecessary suspension and great depreciation; the directors thinking all the time that they were rendering their country good service. A gentleman of the greatest probity and intelligence was formerly at the head of one of our banking institutions, who is known to have inclined to the opinion that an irredeemable paper currency formed the very best circulating medium. If he had induced his directors, in accordance with his views, to declare their notes perpetually irredeemable, it would have been impossible to establish the actual fraudulent motive; and mere especially as, in the particular circumstances, no personal advantage could have been gained, and there would have been no corrupt motive of private gain.
But for the argument which we have heard, I should hardly have thought is necessary to say that fraud is not predicable of a corporation at all. It may, however, be capable of acting loilfully. The law supposes, at least prima facie, every person capable of acting at all, to intend what he does, and the obvious and necessary consequences of his act. Without this there could be no execution of any law. As in the instance quoted in argument, of a public officer exacting more than his lawful fees, under color of his office; undoubtedly this would be prima facie extortion. If there were any thing, however, equivocal in the terms of the law fixing his fees, which might have misled him ; or if, upon the error’s being pointed out, it were promptly corrected, this might serve to show that it was the effect of mistake or inadvertence, and not wilful. If a corporation be incapable of willing, it is incapable of making any contract, for every contract depends on the assent of the will. Then, if ■ an action is charged to be done, it is charged to be wilfully done, and if the act be in itself unlawful, it is charged to be unlawfully done. If this be a contract at all — and on this the defendants must rely, to entitle themselves to any protection of the court — it must, as I have said, be mutually binding. In every case of a continuing contract, the failure of one party to perform any material stipulation on his part, authorizes the other party to put an end to it. The object of the scire facias is to allege such breach, and require the *508 party to show cause why the contract should not be declared at an end; as the quo warranto, on the supposition that, by the breach, it is cle facto at an end, seeks to restrain the party froth going on with it. Such breach is charged by the declaration in the present case, and I know of no authority or reason to require an addition to the phraseology of any expletives, such as “ wilfully” and “ unlawfully.” And I may observe, that if judgment should be against the defendants, there would be no forfeiture, in any other sense than as an agent or overseer might be said to forfeit his contract, by failing to perform his part of it.
But you cannot attribute to a corporation any act to which motive is requisite to give character. It is a legal person — an abstraction of the law — to which you cannot attribute any moral disposition whatever. It can commit neither crime nor tort — though its agents or members, as individuals, may. A corporation answers without oath, and the reason assigned is, that it cannot be prosecuted for perjury. In the case of the city of London, it was asked, how would you prosecute a corporation for high treason— would you hang up the common seal ¶ And it might have been added — if, upon conviction, you wrnuld punish it in the persons of its members, would you hang up the guilty and the innocent corporators together 1 — those who had resisted the treason, as well as those who had concurred in it 1 If the corporation, by vote of a majority, should command treason or murder, under the common seal, certainly this would be no corporate act; it would be the act of the individuals who concurred in it, and as individuals they would be punishable. If a majch’ity should command a trespass, would you charge this abstraction with having-committed the act with force and arms? If by the vote of such majority, a libel should be published under the common seal, would you charge the corporation with having published it maliciously, exempting the guilty individuals who directed it from their personal responsibility 1 So, if the majority should command an act of deceit, to the injury of individuals, would you, by an action against the corporation, anda recovery out of the corporate funds, inflict penal damages, not only on the guilty individuals of the *509 majority, who commanded it, but the innocent minority, who may have done every thing in their power to resist and prevent it; the former being exempted from all personal responsibility? It is charged in the present case, that the president and directors of the bank resolved to suspend, and did suspend, specie payments. But the president and directors are the agents and servants of the stockholders, and it is the notorious rule of law, that the principal is not responsible for the tortious acts of his servant, committed in the course of his employment. But it cannot be necessary to pursue this subject further. Notwithstanding the extensive research which has taken place, no authority or dictum has been found, in any elementary book, or decided case; from Bracton to the latest of the reporters of our States, in which the proposition contended for has been affirmed or suggested. In .the case cited from Indiana, though abundant and gross fraud was established, it is no where said that this is necessary to work a forfeiture. Yet I have no doubt but that acts fraudulent in themselves, may be a cause of forfeiture; not that fraud is attributable to the corporation, but that the act in itself is a violation of the terms of their charter, a breach of their contract. The fraud, if any, is to be visited upon the individuals who committed it.
If the suspension of specie payments in question be,prima facie, a breach of the terms of defendants’ charter, it remains to inquire if it has been justified or excused. This has been attempted by the fifth plea. That plea I understand to be, in substance, that at the time in question, there was an extraordinary and embarrassed condition of the commercial affairs of the country; other banks having suspended, there was created an extraordinary, and irregular, demand for specie, for foreign exportation, and otherwise, so that it became impracticable to continue the payment of it without great injury to the State and suffering to individuals; that the safety of the State required the suspension; that they were solvent, but suspended payments with a view to the public safety and advantage.
And is this the sort of investigation on which a Court is called upon to enter ? On both sides of the argument, there was urged in the strongest terms, the danger of entering *510 into theories of trade or political economy; their uncertainty, and the contradictory views of those who advance them. On one side, it is thought the best course, in cases of such commercial embarrassment, to leave the evil to work out its own remedy ; that by this course, if the present suffering be severe, a sound and healthy state of things will be sooner restored, and permanent prosperity more effectually established. On the other side, it is thought that there may be measures of relief and mitigation, which, while they alleviate the present evil, may lead gradually, but not less effectually, to the re-establishment of a better state of things. In such inquiries, we could only be guided by the speculations of financiers, commercial men, and political economists; who hardly come within the class of professional men, of whom it is said, cuique in sua arte credendum. Are Judges to become the partizans of these and their theories; abandoning the sobriety and certainty which have hitherto been the characteristics of legal proceedings 1 Are we to determine when the public good or safety requires a prohibition of the exportation of specie ? Have we a dispensing power, to protect banks in the refusal to pay their creditors, in order that they may be able to-indulge their debtors 1 Have courts the power to pass relief laws'? These things may appertain to legislative powers ; but if courts should assume them, it would be quite as bold and unwarrantable an usurpation, as has ever been attributed to Legislatures, and might justly subject them to more, perhaps, than the censure of public opinion.
But let us examine more closely some of the details of this plea; which, I suppose, is drawn with as much ability as could be brought to the task. After stating the suspension of banks in various cities of the Union, (and there might be some uncertainty in the inquiry how large a portion of the banks of the country must suspend, before the effects afterwards spoken of can be brought about,) the plea adds, “ by reason whereof, an extraordinary scarcity and appreciation of gold and silver coin took place.” Now, in a general sense, every thing which is the subject of commercial exchange may be said to appreciate, or depreciate, as its value changes relatively to other things. But as the constitution of the United States has made gold and silver the *511 measure of value ; as whatever you buy, or sell, must be paid for in this medium, if required; it is loose and inaccurate to speak of it as having appreciated, or depreciated, in reference to other commodities. It is with reference to this, I suppose, that it is alleged in a subsequent part of the plea, that the notes of the bank were not depreciated. Gold and silver had appreciated: for the plea states that the bank had suspended — that is to say, that its notes were not convertible into gold and silver at the pleasure of the holders — that is to say, that one could not be obtained in exchange for the other — that is to say, that one had depreciated relatively to the other. The plea is contradictory. The plea proceeds, “ whereby the payment of the notes of the Bank of South Carolina, and of the debts due and owing by the said bank for deposits, in gold and silver, became impossible.” The word impossible certainly is not used in the ordinary acceptation. It is not alleged, that all the gold and silver in the vaults of the bank had been paid out, and if any remained there, certainly there was no physical impossibility of paying it. It is stated that the bank was, and continued solvent. Taking the whole plea together, it evidently means that the continued payment of specie was impossible, without producing the injurious effects spoken of in reference to the suspension of 1839.
With respect to that suspension, after .stating the previous suspension of other banks, it is added, — “ that in consequence thereof, the demands for gold and silver in payment of bank notes, and deposits in bank notes, became, and were, altogether extraordinary and irregular.” That the demand for specie will be irregular, is inevitable from the fluctuations of human affairs, and in general, banks, as well as individuals, are bound to be prepared for such fluctuations. It would be rather a difficult and dangerous discretion, to determine when the demand was so extraordinary, as to render suspension necessary. I may observe, that if the case were before a jury, it might be difficult to establish such necessity, as there were various other banks, in the same city, and at the same time, which did not suspend. The plea goes on, “having no reference to the quantity of paper in circulation, or unto the credit or solvency of the banks on which such demands were made, *512 but only to the drain of specie for foreign markets, and for the traffic in gold and silver, carried on by persons trafficking in the precious metals.” As I have said, can it be supposed that courts are to judge of, and remedy, the evils arising from the drain of specie for foreign markets, or the trafficking of individuals in the precious metals ? After asserting the solvency of the bank, the plea proceeds, “ but by reason of the confusion of commercial affairs, and the extraordinary demands for coin, the said bank was not able to pay its dues and liabilities, in gold and silver coin, without making oppressive and ruinous exactions on its own debtors.” I say nothing of going into a legal investigation of the confusion of commercial affairs, and the extraordinary demand for coin. The charge against the bank is of having violated its contract of incorporation. The answer is, that we have done so with a good motive, and for a benevolent and patriotic purpose; we have refused to pay our debts, that we might not press injuriously upon our debtors. It is evidently not a plea of legal justification or of legal excuse, but of moral or political excuse. If a breach of contract has been committed, it shews causes why the breach should be waived; if a forfeiture has been incurred, why the forfeiture should be remitted. It is a political plea, and such an one as I hope will never again be offered to a court.
I do not say that it may not be a very good moral, or political, excuse. With that, as a Judge, I can have nothing to do. It has, however, been cheerfully admitted, through the whole course of the proceeding, that the conduct of those having the government of the bank, has been actuated by the most praiseworthy and public spirited motives, and that, from the character of the individuals concerned, it is impossible to attribute to them any other motives. It is for the Legislature to judge of the financial of commercial condition of the country, and provide the means of relieving its embarrassments. It is for the Legislature, also, if a violation of the charier has been committed, to determine whether proceedings shall be instituted to vacate it. I do not say that exigencies may not exist, in which the public safety may require such suspension. Far be it from me to judge or determine of any such matter. But *513 if such a state of things should actually exist, it is to be supposed that upon application to the Legislature, it will authorize the refusal to pay in gold or silver ; or if the exigency should suddenly and unexpectedly arise, so that it would be impracticable to obtain the previous authority of the Legislature, that it would subsequently sanction the act, or forbear to enforce the forfeiture. It would, be unbecoming in this court to suppose, of a co-ordinate branch of the government, that such an application would not be entertained with all due justice and consideration. And I would most seriously impress, if I could, upon every friend of law, order,, and limited government, that nothing can be more likely to provoke the exercise of irregular and arbitrary authority, than to deny, or obstruct, that which is unquestionably just and constitutional. Such exercise of authority might be more likely in relation to the present subject, as it is too plain to be argued, that if the suspension now in question does not amount to a violation of the charter, there is absolutely no limit whatever to such right of suspension, but the pleasure of the banks themselves. If the judgment should be, that banks are not at all bound to redeem their notes in gold or silver; or what would amount to the same thing, that it is at their discretion whether they will redeem them or not; can any one fail.to perceive the continual temptation, of the strongest interest, to abuse their functions, and the enormous evils which may result to society from such abuse 1 Is it better, safer, more for the interest and security of society, that these interested parties should be the judges of the exigency, of the Legislature of the State'? The latter, in a technical sense, is a party to the contract, but it has no interest beyond the public advantage. I think it ought not to be said, that in directing this proceeding, the Legislature has in any degree prejudged, or expressed an opinion in relation to the case. There is no other authority to direct such proceeding, and it is impossible that it should in any case direct it, without thus far expressing the opinion, that there are grounds for inquiry. That it offered an alternative, by which even the inquiry might be avoided, certainly cannot make it any more an expression of opinion.
There are various topics which have been urged with *514 much zeal in the progress of the cause, which I should not think it necessary to touch upon, even summarily, but from respect to the sources from which they w’ere-derived. Such is the argument drawn from the provision of the charter of the bank, that the bank shall not contract debts to more than three times the amount of its capital. If this be an authority to issue to that extent, then the fact that the bank had not made issues or contracted debts beyond that extent, would have been a justification, and should have been pleaded. But no one has contended that this amounts to a justification. If the bank had contracted debts to three times the amount of its capital, and loaned out its specie, so as to insure its own inability to redeem its notes and deposits on demand, could this have been a justification'? If not an authority to issue to this extent, it amounts to nothing as an argument. The bank was bound to conduct its affairs prudently, so as to be able to meet the demands upon it. It would be as reasonable, if there had been no such provision, to argue that the bank was authorized to issue to any amount they might think proper, and if they had done so to ten times the amount of capital, rendering their inability to redeem inevitable, there was no violation of the charter. To have contracted debts to more than three times the capital, would have been a violation of the express terms of their charter. It does not follow that they have not violated it by contracting less. The restriction was intended as one security, though a very inadequate one, against the suspension of specie payments.
Such, also, is the argument drawn from the repeated suspensions of the banks during a period of many years, which was said to render the right to suspend almost prescriptive; from the Legislature having sometimes expressly sanctioned such suspensions; and from the fact that it has sanctioned the suspension of its own bank, which, as was said, was created in a state of suspension. Certainly, no one doubts but that banks may suspend with the sanction of the Legislature, as was done by the Bank of England, in 1797. Whatever violations of the charter may be committed, if that does not direct proceedings to vacate them, there is no other authority to call them in question.
If any practical conclusion can be drawn from the facts *515 relied on, it is that the Legislature is apt to listen with very great facility to applications for such sanction. So of other provisions of various laws which it is said look to suspension. Certainly, whenever a bank is created, it is almost inevitable that the possibility of suspension should be looked to, as such things have been very frequent. But I have seen nothing to show that it was looked to with approbation, or that it was contemplated that they should depend on the mere will of the banks themselves. In the instance of directing the Comptroller General not to receive the notes of banks who have suspended payments, certainly it does not appear that such suspensions were looked to with approbation. The banks have sometimes thought it necessary to excuse themselves, as being in some default. But I cannot think it necessary to pursue these topics.
' I have not thought it necessary to refer to authorities, for we have hardly any direct authority upon the point. The decisions in the cases from the New York Reports, turn upon the construction of a particular statute of that State. There are expressions in them, on general principles, favorable to the conclusion to which we have come. There is a dictum in the case cited from Pennsylvania which looks the other way ; too lightly thrown out, I think, if by it was intended the conclusion which was drawn from it. As to the case from Alabama, the question seems not .to have been necessarily involved in it, nor to have been very fully considered by the Judge. But however this may be, and notwithstanding the respect which I entertain for the judgment and learning of that Judge, I find myself unable to concur with him.
I think the demurrers to the second and third pleas should be sustained; that the demurrer to the replication to the fifth plea, should go to the plea itself, which should be overruled; and that the cause should be remanded, to be tried on the pleas of the general issue and nul lid record.