THE AMERICAN COLONIZATION SOCIETY, plaintiff in error, vs. LUCIUS J. GARTRELL, adm'r, defendant in error.

By its charter, the American Colonization Society is authorized and empowered to receive property by bequest or otherwise, and to use or dispose of it, at its discretion, "for the purpose of colonizing, with their own consent, in Africa, the free people of color residing in the United States; and for no *other purpose whatever.*" Francis Gideon bequeathed, by his will, to the Society, "all of his *slaves.* for the purpose of sending them to Liberia, in Africa."

*Held,* That the Society was incompetent to take the property under their charter.

Could the trust be executed by another? Quere.

Can the American Colonization Society maintain a suit in the Courts of Georgia? Quere.

In Equity, in Fulton Superior Court. Decision on demurrer, by Judge BULL, at chambers, 22d June, 1857.

This was a bill filed by the American Colonization Society, (incorporated by the Legislature of the State of Maryland,) against Lucius J. Gartrell, administrator with the will annexed, of Francis Gideon, deceased, late of the county of Fulton.

The bill states that said Francis, on the 25th day of May, 1853, made and published his last will and testament.

The bill further states that said testator departed this life on or about the     day of      , 1853, leaving said will in full force and unrevoked, and possessed of a large estate, both real and personal.

That on the 30th September, 1853, said will was proven, and admitted to record, by the Court of Ordinary, and the executors therein nominated, Chase and Holbrooks, renounced and refused to qualify. Whereupon, Lucius J. Gartrell, of said county, the son-in-law of testator, and husband of the said Louisiana O. Gartrell, was appointed administrator with the will annexed, and gave bond, and took the oath required by law, to administer the estate according to said will, reserving and excepting the clauses emancipating the slaves, and giving them any portion of said estate.

The bond executed by said Gartrell, is conditioned *to administer the estate according to law.*

The bill further charges, that after his appointment and qualification as administrator aforesaid, said Gartrell possessed himself of the whole estate of the testator, consisting of lands, slaves, bank and railroad stocks, bonds, notes, and other evidences of debt, household and kitchen furniture, and divers other articles of property, all of the value of about seventy thousand dollars, and has ever since received the rents and profits thereof, and has paid the legacies given to testator's sister's children named Everett.

The bill further states, that since the death of the testator, Louisiana O. Gartrell has departed this life, whereby the one-third of the residuum of said estate, directed to be vested at interest for her during her life, has vested absolutely in complainant, as remainder-man, and that all the legacies given to complainant, in trust and for the use of said slaves, when they shall be delivered over to complainant, and sent to 'Liberia, are now due and payable, but the said Gartrell claims and holds them as his own, and denies that complainant has any right to said slaves, or to the legacies bequeathed to them or for their use. And complainant, by its agents and attorneys, have applied to said Gartrell, and requested him to deliver up said slaves to complainant, and to pay over the legacies aforesaid, which he refuses to do.

The bill prays that said Gartrell be decreed to deliver to complainant, the slaves mentioned in said will, with their increase since the date of said will, if any, and to account for and pay over to complainant, the legacies given for the use and benefit of said slaves, when they shall be sent to Africa, according to the directions and provisions of said will, &c.

Defendant demurred to this bill, on the following grounds, to-wit:

1st. Because the Act to incorporate the American Colonization Society, under which the complainant is proceeding, does not confer the right to bring and maintain this action.

2d. Because, by the said Act, a body politic was created and declared, under the style of the American Colonization Society, and the bequests in the will, are to the "President and Directors, for the time being, of the American Colonization Society.

3d. Because said will is in contravention of the laws of the State of Georgia, on the subject of manumission, and that portion of the will attempting to free testator's slaves, and giving them legacies, is void.

4th. That, according to the statements of complainant's bill, defendant is expressly exempted from executing the clauses in said will, giving freedom and legacies to the slaves. The bill showing defendant to be acting under the authority of a Court having jurisdiction, he cannot be an executor *de son tort*.

5th. Defendant denies the right of the complainant, as such corporation, to call upon and to require him to deliver up any of the slaves in said will mentioned, and their increase, or to come to any account with said complainant, touching any of the property of the deceased, mentioned in said supposed will.

6th. That there is no equity in said bill.

The argument in open Court was waived, and counsel submitted to the Chancellor written briefs, who, after consideration, at chambers, pronounced his decree, sustaining the demurrer and dismissing the bill.

And to this decision counsel for complainant excepts.

CLARK & LAMAR; and E. A. NESBIT, for plaintiff in error.

JOHN ERSKINE; and ROBT. TOOMBS, *contra.*

*By the Court.*—LUMPKIN J. delivering the opinion.

We concur in the clear and conclusive opinion of the able Judge who decided this case, namely: That the Colonization Society is incapable of taking or holding property for any purpose inconsistent with, and forbidden by, its charter.

It can receive it upon no other trust. That to attempt, in this or any other case, to claim it for any other purpose, would be a fraud upon the law, a fraud upon the donor, a fraud upon the heirs, and a fraud upon the slaves themselves.

By their constitution, the association is empowered to receive property by bequest or otherwise: and to use it or dispose of it at their discretion, " for the purpose of colonizing, *with their own consent*, in Africa, the *free people* of color residing in the United States, *and for no other purpose whatsoever.*" Now, the will of Francis Gideon, under which the complainants sue, bequeaths to the Colonization Society, " for the purpose of sending them to Liberia, in Africa, all his *slaves*, to-wit: &c." The negroes, then, are given as *slaves*, and not as *free persons of color*, to be sent, not with, but with or *without* their consent, to Liberia, in Africa. Indeed, the testator could only give them as *slaves*. For, had their status been changed by the will, from slavery to freedom, before the gift attached, the will itself would have been void by the statutes of 1801 and 1818. *Cobb*, 983, 989.

We repeat, then, that the unconditional right to them as *slaves*, could not be vested in the Society, under their Act of incorporation; neither could they take and hold them in trust, for a purpose not allowed by their charter; that is, to transport them, as *slaves*, to the colony in Africa, with or *without* their consent.

I need not cite cases to show that the powers of a corporation being limited, a trust beyond those powers cannot be executed by the corporation. *A fortiori*, cannot this be done when, by the express terms of the charter, the corporation is *"forbidden* to take or use property for any other purpose whatsoever, other than that specified in the Act of incorporation.

A person, like a State, may do whatever is not prohibited. A corporation, like the confederation of this Union, can do only what is expressly allowed by its charter. It is a lamentable fact, however, that while this is true in point of theory,

both as it respects corporations and the Federal Government, in point of fact, the *creature* bound by strict compact has become more omnipotent than its *sovereign author*—restrained by no fetters but of its own making. 1 *Ves. Sen.* 534; 4 *Wheaton*, 636; 9 *Wall's*, 551; 6 *Connecticut Reports*, 304; *Ang and Ames on corp.* 60, 86, 139; 2 *Kent's Com.* 298, 299; 1 *Kyd. on corp.* 72; 4 *Peters*, 152; 2 *Cranch*, 127; 15 *Johns.* 358; 3 *Barn. and Cress.* 1; 3 *Pick.* 237; 1 *Penn. R.* 49; 12 *Mass.* 555; 1 *Paige, ch. Rep.* 214; 8 *Johns.* 422; 3 *Baule*, 170.

It is argued, that conceding that the trust is not strictly within the provisions of the charter, yet, that the Society may carry out the purpose of the testator, without transcending the limits of its powers. That it may take slaves out of the State, manumit, and then colonize them in Africa. That the will, by its own natural operation, ultimately constitutes these slaves a class that the Society is expressly permitted to colonize. That when these slaves are recovered and carried out of the State, the trust reposed in the Society is *ipso facto* executed to the extent of conferring freedom; and thus they become the free people of color contemplated by the charter. That the Court should only have considered the capacity of the trustee to receive property; whether he would abuse the trust, or would execute it, were questions for the State of Maryland, which granted this charter, and not for the Courts of Georgia. That neither the heir, nor any private person, could contest the right of a corporation to take the property, and execute the trust; but that this right belongs alone to the State, in its sovereign capacity.

These are, in the main, the propositions upon which the plaintiff in error relies for a reversal of the judgment rendered in the Court below.

The disposition in the will is a bequest of all the *slaves* of the testator to the society, for the purpose of sending them to Africa. How do counsel arrive at the conclusion that so soon as these slaves cross the boundary of the State, they be-

come *ipso facto* free, and therefore constitute the identical class contemplated by the charter of the Colonization Society? I am aware that it is the doctrine laid down in *Wade et al. vs. American Colonization Society, Smedes and Marshall's Reports* 697. It is one, however, to which we cannot yield our assent.

That these negroes were slaves in this State, cannot be questioned, talk as we may about their *inchoate right* to freedom. They were slaves before the will of Gideon was executed. They cannot be any thing else, here, afterwards. Any *attempt* made to change their condition *here*, by deed or will, would be nugatory. Being then, bondsmen *here*, do they become freemen when they cross the Savannah river? Do they become so in any State, slave or free, in their *transit to* Africa? Surely not. The Society itself, has no power, either by their charter, or by the will, to bestow freedom upon these slaves, in this or any other county, except Africa. It is doubtful whether by removing them to a free State, this trustee could, by operation of law, enable these slaves to acquire their freedom. No such power has been delegated to the Society to do this; and they would be acting in violation of their trust. And I am not prepared to admit that under such circumstances, the slaves would acquire a right to their freedom.

But suppose they could, what security is there that the trustee would do this? But concede that this might and would be done; what certainty is there that the slaves would give their consent to go to Africa? And being free, it is indisputable that they could not be transported and colonized against their will. At any rate, force could not be employed for this purpose by the American Colonization Society. The basis and apex of this institution, being one of persuasion, not of force. So then, it is plain that if the charter itself does not enable the Society to send these *slaves against their wish*, to Africa, there is no other way or means by which the intention of the testator can be effectuated, through this

Society. For the Society to carry them to Africa, the slaves must be free and give their consent, as a condition precedent. And no sooner do they become free, than as an attribute of freedom, they may give or withhold that consent as they see fit. And thus slaves that were directed to be colonized in Liberia *only*, and which this Court, neither under the odious dotrine of *cy pres* nor any other principle or practice of the Court, would decree their freedom any where else, might obtain their liberty in Canada, or any free State of the Union, or any slave State where domestic manumission is allowed ; and neither the Courts of this State or of Maryland, or of any other place, at the instance of a private person, or of the sovereign power itself, could interfere. And this, in our judgment, destroys the whole fabric of the argument in behalf of the plaintiff in error.

The charter of the Society, then, only authorizing it to hold property, to colonize free persons of color, residing in the United States, by their own consent, and for no other *purpose whatever*, and this being a devise not to colonize *free persons*, but to send off *slaves*, that they might become free, our opinion is that the right set up in this bill, is negatived by the express language of the charter. The law of Maryland is the law of this case; and must govern the extent of the Society's right. We cannot give to it any greater power than by that law is given to it. The law of Maryland prohibits it. 8 *Gill and Johns*, 319. There is not only no power for the Society to take a bequest of slaves, to colonize them, but it is directly interdicted. The legacy is void, not merely for want of power in the corporation to take for such a purpose, but also because the charter forbids them from holding for any purpose but that specified in it.

It need not be disputed that where a corporation has capacity to take and hold property for itself, it may hold as trustee, unless restrained, as in this case, to a particular trust, or unless it be restrained from holding as trustee at all. And this is the extent to which the authorities go. And if cases

be found seemingly contradictory, it will be discovered upon examination, that in all such, there was nothing prohibitory in its character in the charter. If the statute declares that the corporation may hold property for a certain specified object and no other, it can, neither in law or equity, hold for another such prohibited trust. And if any case can be cited contrary to this, as there cannot be, it would not be law, because it is against reason and common sense, of which law is said to be the perfection.

But we forbear to pursue this discussion further. The objections to any view of this case which has been presented, are manifold and insuperable. The truth is, the testator having mistaken the law as to the powers of the Colonization Society, to which he intrusted his slaves, the ingenuity and industry of learned counsel, have been taxed in vain to extricate the bequests of the will from the consequences of this misapprehension. In seeking to avoid Scylla they are engulphed in Charybdis. *Incidit in Scyllam ubi vult vitare Charybdem.*

But it is said that while it may be true that if the trust be repugnant to the declared purpose for which the corporation was created, that may furnish a good ground why the *corporation* cannot act, still the trust itself will not fail, if otherwise unexceptionable, on account of the incapacity of the trustee to act; and that it is only necessary for the proper Court to appoint a new trustee, in order to perfect the object of the trust, and *Sonley vs. The Clockmaker's Company,* 1 *Bro. Ch. Rep.* 81, and other precedents in the books sustain this position.

Concede that this is a valid trust, the complainants having, as we have shown, no legal or equitable interest, cannot enforce its execution. And this is sufficient to defeat this bill. The only prayer in the bill is that the defendant, Gartrell, be decreed to deliver to *complainauts* the slaves mentioned in said will, with their increase; and that he account for and

pay over to *complainants* the legacies given for the use and benefit of the said slaves.

Whether any other party can maintain a bill, is not at present, therefore, the question. No point is made as to the substitution of another trustee by the pleadings. If the complainants cannot maintain the bill, and we are clear that they cannot, they must go out of Court, and the same rule applies to all the other bequests in the will, collateral to and dependent upon that which we have been considering.

The bequests to the Colonization Society being void on account of the incompetency of the legatee to take, we are not prepared to admit, that *in this case,* the trust, if indeed it be one, attempted to be created by Gideon, can be executed by another. The Colonization Society is unlimited as to duration. It is endowed with the attribute of perpetuity. Apart then from its means and facilities to superintend the removal and settlement of these slaves, and providing for them in their new home, no *individual* could be substituted in its place, and clothed with its functions. The testator may not have been willing to have placed his slaves in the power, custody or control of any other legatee than the very Society to which the trust was confided. We almost have the right to assume that it was the intention of the testator, that this particular trustee, and no other, should execute the trust; and we could be strongly inclined to hold that in as much as the Society is incapable of acting, that the trust must fail altogether.

That many trusts are valid if executed by the trustee that cannot be carried into effect compulsorily I have no doubt. So that the question here, is not merely as to the validity of the trust, so far as its objects and aims are concerned, but whether it is one which the slaves themselves, or any one in their behalf, can compel the administrator of Gideon or his heir at law, to execute? Where there is no trustee appointed or the appointment is void, and there is a valid trust, the heir or executor will be decreed to be a trustee. But does

not this apply only to cases where *cestui que trust* can sue or compel an execution? and will a Court of equity appoint trustees except at the suit of those interested as *cestui que trust* ? If they cannot maintain a suit, equity cannot enforce the trusts. Such was probably the opinion of this Court in *Hunter, guardian, etc. vs. Bass, ex'or,* 18 *Ga. Rep.* 127. It is true that the Court in its decision in that case, say that "if the slaves take no rights under the will, then none on behalf of the slaves do, or on behalf of the slaves can appear in Court on pretense of representing the rights of the slaves." But to hold, that the slaves had no rights, presupposes that there had been a hearing as to their rights, and yet the Court below held, and this Court affirmed the judgment, that neither the Colonization Society, on its own account or a guardian *ad litem* for the slaves, should be made a party to the litigation then pending. In Tennessee and some of the other States, statutes have been passed to meet this emergency. Hence decisions are to be found in the Reports of those States contrary to the opinion here expressed, 4 *Hump.* 208 ; 2 *Yerger,* 123, as to the want of capacity on the part of the donees or trustees to maintain a suit to enforce analogous trusts. The leading case in 2 *Hills Ch. Reports,* 305, is an authority in favor of the position, that neither the slaves nor any person for them can sue. True, the Court in Carolina held that where the heirs come into Equity, claiming distribution, the Court would decree an execution of the will, by the executors. But here, neither the heir at law nor the representative of the estate is moving. The application proceeds from the other side. The two cases relied on in 7 *S. & M G..,* *Mr. Justice Clayton* from Virginia, namely, 1 *Leigh,* 465, *and* 4 *Leigh* 252, do not touch the point.

In *Knight, next friend, against Hardeman, et al., ex'rs, etc.,* 17 *Ga. Reps.,* 253, this Court intimated a pretty strong opinion against the power of a Court of Equity, to grant compulsory relief in this case: they say that the jurisdiction of chancery is "exceedingly questionable under any circumstan-

ces, no such right having been conferred by statute." That the weight of authority preponderates strongly and decidedly against the right of a slave to be a *cestui que trust*, we entertain not a shadow of doubt, and in this case equity could interpose upon no other principle. With these observations, we shall dismiss this branch of the case, the consideration of which has perhaps been prematurely forced upon the Court, by the course taken in the argument. The voluntary performance of a trust by the heir or legal representative in behalf of slaves, is one thing. Its coersive execution by the Courts, quite another and a different thing, and it will not do to lose sight of this distinction. Nay more, while the Courts might decline to interfere, to *prevent* the execution of such a trust, they might consistently and without involving any absurdity, refuse to intervene, to compel its execution.

There is another and a highly important view to take of the main question involved in this case, and we approach it with a gravity commensurate with its magnitude. Is not the American Colonization Society outlawed as a suitor from the Courts of this State?

One of the privileges of a British freeman and an American citizen is, to bring suits in the Courts of their respective countries, upon all lawful contracts under the Constitution of the United States, and the citizens of each State are entitled to this privilege in any other State. But a corporation is not a citizen, *Bank of the United States vs. Devaux, 5 Cranch,* 61, and consequently is not embraced within this provision.

Corporations are not *persons*, 12 *Peters*, 99, 100. Personal rights are original and unlimited, except by law ; corporate franchises are derivitive and specific.

The right of the corporations of one State to sue in another, is now too thoroughly incorporated into our system of jurisprudence, to be called in question. This right depends upon the comity of States or nations, which means generally the right to do all things which belong to the citizens proper, of each country, and which they are not precluded from do-

ing by some positive law of the State; among these rights is the right to sue in their Courts respectively.  *Mr. Justice Story, in his conflict of laws,* 37, says that "in the silence of any positive rule affirming or denying or restraining the operation of foreign laws, Courts of justice presume the tacit adoption of them by their own government, *unless they are repugnant to its policy or prejudicial to its interests.*"

Chief Justice Taney, in delivering the opinion of the Court, in the *Bank of Augusta vs. Earle,* 13 *Peters Reports,* 519, adopts with approbation the principle stated as above by Judge Story, and proceeds to inquire whether by the Courts of nations, foreign corporations are permitted to make contracts, and to enforce them abroad, and he says "we can perceive no sufficient reason for excluding them, when they, are not *contrary to the known policy of the State or injurious to its interests.*"

The only inquiry then, in the present instance is, is it repugnant to our State policy, and prejudicial to its interests, to allow the American Colonization Society, to sue in our Courts ?   And let it be remembered, that it is not the comity of the Courts, but the comity of the State which is administered ; and ascertained in the same way, and guided by the same reasoning, by which all other principles of municipal laws are ascertained. See *Story's Conflict of Laws, Supra.* Guided by this rule, it only remains to inquire, whether any, and if so, what has been the action of Georgia, as it respects this Society.

This society was organized with the approbation and under the patronage in part, of the wisest and best men in the South from Maryland to Louisiana, including the most distinguished and patriotic citizens that Georgia has ever called her sons.   Hence in 1817, by an Act of the Legislature, the Governor of the State was directed to deliver to the Colonization Society, Africans illegally imported into the State, and "to aid in promoting the benevolent views of said society, in such manner as he may deem expedient." (*Cobb* 989.)

And by a resolution, again in 1820, certain Africans illegally imported were offered to this society. (*See resolutions of* 1820, *Vol. IV. p. 5, of resolutions.*

I shall be pardoned a moment's digression here. It has been suggested, that not only is the language of the Act of 1818, sufficiently broad to extend to extra territorial as well as domestic manumission; but that so applying it, and thus cutting off foreign emancipation, is the most effectual method of preventing the increase of free persons of color within this State, the great end for which the Act of 1818, was passed. For, say the advocates of this construction : send them out of the State, and give them their freedom and they may return; whereas, by refusing to free them altogether here, or anywhere else, and the mischief is extirpated entirely.

In the first place, I say it respectfully, but with confidence, that the words of the statute themselves, carefully examined, negative the idea, that they do or can apply to manumission abroad. But suppose they would admit of this interpretation, would the *Courts* be justifiable in the face of the known meaning and intention of the Legislature, so to construe them ? And does not the action of the Legislature to which I have referred, which took place immediately before and after the Act of 1818, to say nothing of the history of the times and of cotemporaneous interpretation, show conclusively, that such a construction is doing manifest wrong and violence to the will and purpose of the Legislature?

Mr. Devarris in his treatise upon statutes, (chapters ix. and x.) lays down as a *lex legum*, a universal maxim, that in all cases, the design and intent of the *law-maker*, when it can be indisputably ascertained, *shall prevail.* Referring to the state of public opinion in Georgia, in 1818, respecting foreign manumission as reflected in the light of the legislation which I have cited, will any one venture the assertion, that the Act of 1818, was intended to prohibit colonization in Africa? That in so holding, he is giving a true exposition of the statute ? That such was its object ? That he is execu-

ting it according to its meaning? And who has the right to do otherwise? Whatever may be his personal views as to the policy or expediency of such a construction? Lord Mansfield who was never suspected of being over timid, declared in the case *Hay vs. Edie*, (1. *S. R.* 313,) that he would not take upon himself such authority. Resuming then the line of my investigation, I remark, that the next action on the part of this State, concerning the society was in 1827, at which time the public mind had been roused from almost fatal sleep, to a proper consideration of the institution of slavery, and the dangers which beset it. It grew out of the question as to the right and propriety of the Congress of the United States' appropriating money from the public treasury, in aid of the Colonization Society. The measure was fully discussed; and it resulted in the adoption by the Legislature of a very able report and resolutions, condemnatory of the project.

*The General Assembly* speaking in behalf of the people of Georgia, say "they know and strongly feel the advantages of the Federal Union; as members of the Union, they are proud of its greatness; as children born under the Union, they will ever defend it from foes, internal as well as external; but they cannot and will not, even in the preservation of that Union, permit their rights to be assailed; they will not permit their property to be rendered worthless; they will not permit their wives and their children to be driven as wanderers into strange lands; they will not permit their country to be made waste and desolate, by those *who come among us under the cloak of a time-serving and hypocritical benevolence.*"

At the first establishment of the colonization society, whatever may have been intended or avowed as its object, your committee believe that they can say with truth, that the general impression in the Southern States, as to that object, was, that it was limited to the removal beyond the United States, of the *then* free people of color and their descendants, and

none others. Under this impression, it at once received the sanction and countenance of many of the humane, the wise and the patriotic among us. Auxiliary societies were formed in our own State; and the numbers, the influence and the resources of the society, were daily increased. It is now ascertained that this impression was false, and its officers, and, your committee believe, the society itself, now boldly and fearlessly avow, that its object is and ever has been, to remove the whole colored population of the Union to another land; and to effect this object, so wild, fanatical, and destructive in itself, they ask, that the general fund to which the slave-holding States have so largely contributed, should be appropriated for a purpose so especially ruinous to the prosperity, importance and political strength of the Southern States." (*Dawson's Compilation, p.* 84 *of the Resolutions.*)

Again, in 1828, the Legislature having under consideration a resolution from the State of Ohio, say: "These States must view with jealousy and distrust, all associations having for their object the abolition of slavery. The principles propagated by the enthusiastic devotees of this project are calculated to have the most pernicious effects; exciting false hopes of liberty; producing discontent and dissatisfaction in the mind of the otherwise happy and contented slave; and a restlessness for emancipation, when the actual state of things forbids the possibility of it at present. The Colonization Society is considered by your committee as one of a dangerous character in this respect. Its schemes of colonization are vain and visionary. Its professed objects never can be accomplished. They are wholly impracticable. This institution, therefore, should not, in the opinion of your committee, receive the support, countenance or patronage of Congress. And not being a matter of national interest, the goverment has no right to take it under its protection, or make appropriations for its support." *Dawson's Compilation, p.* 116, *of the Resolutions.*

Finally, in 1829, the Legislature having under consideration resolutions from the States of Louisiana and Mississippi, say: " The people of the slaveholding States cannot but be aware that there is in the other States an influence already great, and daily increasing, composed of various materials, but bound together by a common feeling, which has for its object, and even now, seriously threatens, not only to destroy the prosperity of the southern slaveholding States, by subjecting them to tribute, but to prostrate their political strength and to deprive them of inestimable privileges now secured to them by the Federal Constitution. In evidence of the existence and power and operation of this influence, your committee will, without going into detail, refer to the late Tariff Acts; the various amendments proposed to the Constitution, in different quarters, with a view to the abolition of slavery; the open and daring operations of abolition societies; and the more secret and disguised but dangerous movements of the Colonization Society; the effects already produced in Maryland; and the desperate struggle now in eventful progress in the State of Virginia." *Dawson's Compilation, p. 139, 140, of the Resolutions.*

Can there be a doubt but that the State of Georgia views the aims and objects of the American Colonization Society, in the language of Mr. Justice Story and Chief Justice Taney, as "contrary to the known policy and prejudicial to her interests?" If so, the comity of the State does not extend to such a corporation. Otherwise, where will you stop? Would a suit at the instance of the Emigrant Aid Society of Massachusetts or the numerous abolition societies in that and other northern States, be tolerated in our Courts? Most assuredly not. And yet our people have spoken out, through their Representatives, with equal clearness and emphatic disapprobation against the American Colonization Society, as against any other association.

Grant that their fears are groundless, and that no evils are

to be apprehended from permitting this Society to come into our Courts of Justice, and to litigate concerning the right of our slaves to their freedom; has not the State the right to settle this matter for itself? and to speak authoritatively to her Courts as to what does or does not come in conflict and collision with the great principles of public policy? And that too, upon a principle that partakes more of a political than a judicial aspect?

I was once, in common with the great body of my fellow citizens of the South, the friend and patron of this enterprise. I now regard it as a failure, if not something worse; as I do every effort that has been made, for the abolition of negro slavery, at home or abroad. Liberia was formed of emancipated slaves, many of them partially trained and prepared for the change, and sent thousands of miles from all contact with the superior race; and given a home in a country where their ancestors were natives, and supposed to be suited to their physical condition. Arrived there, they have been for a number of years in a state of pupilage to the Colonization Society, in order that they might learn "to walk alone and by themselves." And at the end of a half a century what do we see? A few thousand thriftless, lazy semi-savages, dying of famine, because they will not work! To inculcate care and industry upon the descendants of Ham, is to preach to the idle winds. To be the "servant of servants" is the judicial curse pronounced upon their race. And this Divine decree is unreversible. It will run on parallel with time itself. And heaven and earth shall sooner pass away, than one jot or tittle of it shall abate. Under the superior race and no where else, do they attain to the highest degree of civilization; and any experiment, whether made in the British West India Islands, the coast of Africa, or elsewhere, will demonstrate that it is a vain thing for fanaticism, a false philanthropy, or anything else, to fight against the Almighty. His ways are higher than ours; and humble submission is

American Colonization Society vs. Gartrell, adm'r.

our best wisdom, as well as our first duty! Let our women and old men, and persons of weak and infirm minds, be dis-abused of the false and unfounded notion that slavery is sinful, and that they will peril their souls if they do not disinherit their offspring by emancipating their slaves!

Judgment affirmed.