OSWEGO COUNTY—HON. AMOS G. HULL, SURROGATE—November, 1862.

# WYLES v. GIBBS.

### *In the Matter of the Administration of the Estate of* RUSSEL WYLES, *deceased.*

Where a wife abandoned her husband, on account of his intemperate habits, cruel treatment, and absence from home, and during five successive years resided in an adjoining county, with a second husband, and it did not appear that she had knowledge of the death of her first husband, or that he was not generally well known to be living,—*Held*, not such a continuing absence for five successive years, within the provision of 2 Rev. Stat., 139, § 6, as to render valid the second marriage, and authorize the issuing of letters to the woman as the widow of the second husband.

There should be a *bona-fide* absence of the absconding person from the State, and without being known to the other party to be living; or, at least, there should be such an absence from the county as would preclude the idea that he was living, after the most careful and diligent inquiry had been made.

B. WATSON, *for Administrator.*

LUDINGTON, TOWNSEND, PARDEE, and WART, *for Petitioner.*

Joseph Gibbs having filed a petition in behalf of Sophronia Gibbs, his wife, a daughter of the deceased, setting forth, among other things, that the intestate left no widow, and having filed the necessary preliminary papers, was, on the

11th day of March, 1861, appointed administrator of said estate. Since such appointment, a lady, claiming to be the widow of the deceased, and signing her name Almira M. Wyles, filed her petition, claiming the right to administer on said estate.

Gibbs being cited to show cause why the letters to him should not be revoked and set aside, appeared and filed allegations, contesting the right of the petitioner to administration, and alleging the petitioner to be the lawful wife of one Dennis Jordan, then living in Rome, in the county of Oneida.

On the trial, the petitioner presented and proved a regular marriage certificate, from which it appeared that she was married to Wyles, the intestate, on the 14th day of February, 1856, at the town of Redfield. It was also shown that Wyles and the petitioner lived together as husband and wife from that time until the decease of the intestate.

The administrator then proved a marriage between the petitioner and one Dennis Jordan, which was duly solemnized at the village of Rome, on the 29th day of December, 1845. It was also proved that Jordan and the petitioner lived together as husband and wife, from the time of such marriage, for about two years. That Jordan has always resided at Rome since the marriage, and has never been absent from Oneida county until he came to Fulton to attend the trial of this cause.

THE SURROGATE.—The petitioner, in order to avoid the effect of the marriage with Jordan, seeks to bring her case within the provision of the statute, which enacts as follows: " If any person, whose husband or wife shall have absented himself or herself for the space of five successive years, without being known to such person to be living during that time, shall marry during the lifetime of such absent husband or wife, the marriage shall be void only from the time that its nullity shall be pronounced by a court of competent authority." (2 Rev. Stat., 139, 4 ed., 321.)

With a view of showing the absence of Jordan, the pe-

tioner proved that he was an idle man, a "bee-hunter," and grossly intemperate in his habits; that for the last five months that they lived together, he had neglected to provide for her, and that for about a week before she left to return to her father's, he had been absent from home; that she did not hear from him during that time, and knew not where he was, and that she had never seen him since; that before he left he had used violence towards her, and had struck her and otherwise ill-treated her; that she was out of health and had no means of support, and that her friends were poor; that after Jordan had been absent about a week, the cold weather approaching, and she destitute of fuel and food, left a note on the table for him, stating that she was going home to her father's; that her father the same day took her and her child to his residence in Redfield, a distance of about thirty-seven miles by stage route, where she has continued to reside ever since; that Jordan has never made any effort to see the child nor his wife since, nor has he provided any thing for their support.

It appeared, by evidence introduced by the administrator, that Jordan has not only always resided in Rome since the petitioner left, and always upon the same street, and not more than one-eighth of a mile from the place where he resided while he and his wife lived together; but that for about one year and a half after she left, he resided in the same house where they dwelt at the time of her leaving; that Wyles was well acquainted with Jordan, and met him frequently before his marriage with petitioner, and while he was boarding in her father's family.

In respect to the foregoing facts there seems to be no conflict of evidence.

The petitioner testified that she had been informed of Jordan's death, and that she had no knowledge of him after leaving Rome; but it did not appear that she ever returned to the house she had left, or even made inquiry there for Jordan.

Were we to stop here, should we be justified in saying

that Jordan had absented himself from his wife, in such a manner as to bring her case within the statute sufficiently to declare her second marriage valid for the purposes she re-quires?

It was conceded, on the trial, that the conduct of this cruel husband and unnatural father, in brutally ill-treating his wife, omitting to provide for her and for the sustenance of his offspring, and then leaving his home on a drunken de-bauch for a week at a time, and his subsequent neglect to seek them out and contribute to their maintenance, was such an absence as would justify a court in giving a construction to the statute favorable to the petitioner.

Sympathy for an unfortunate woman, and commiseration for the cruelties she had suffered, might be legitimately in-voked in a tribunal of conscience, to induce the court to give as indulgent an ear as possible, consistent with justice, in behalf of the unfortunate, to doubtful testimony. But sym-pathy must have its bounds, and compassion yield, in indi-vidual cases, before the stern and unbending requirements of the public good.

This is not so much a question of evidence. I am required to give a construction to this statute.

Jordan always having resided in the same village since his marriage, and in the same section of the village, and for a year and a half in the same house occupied by himself and wife at the time the latter left, and a part of the time at a public hotel, and never out of the county for a moment for fifteen years, and, so far as any thing appears, never out of the town,—is it a fair construction to say that he has ab-sented himself from his wife, within the meaning of the stat-ute?

The object and intent of the Legislature was to mitigate the rigor of the common law. (3 *Rev. Stat.*, 2 ed., 660, notes.) By the common law, the marriage with Wyles would have been absolutely void. It is contended, on the part of the administrator, that notwithstanding the statute, so far as the rights of the petitioner in this case are concern-

ed, the marriage with Wyles is absolutely void : that the object of the statute was to relieve the party from the penal consequences of the second marriage only. It is true that a remark of Judge KENT would seem almost to hold that doctrine. (2 *Kent's Com.*, 2 ed., 80.) But in the view I take of this case, it is not necessary to decide that point.

Did the Legislature intend by this statute to use the word " absented" in any technical sense ? There is nothing in the subject-matter of the statute to show any such intention. With a fair and legitimate use of language, how can it be said that a person has absented himself for five successive years, who has continued all that time to reside in the same place and to pursue his ordinary routine of life ? Such a construction ought to be given to statutes as will tend to make them operative, and not defeat their fair intent. (*People* v. *Utica Ins. Co.*, 15 *Johns.*, 358.)

The sanctities and immunities that cluster around the marriage contract cannot be guarded too vigilantly. Public policy requires that courts should see that no loose or vague construction be given to statutes upon which hang such momentous consequences to the good order of society, as those which affect the conjugal relation.

Were the foregoing all the facts in the case, a fair construction of the statute would require me to hold that Jordan had not absolutely absented himself in such a manner, or to such an extent, as would sustain the petitioner in the claims she presents.

But there are other facts that bear on the question adverse to the petitioner.

It seems that she went to Rome on two occasions before her marriage with Wyles, and after she had left Jordan; and on one occasion remained a week, but without going to the house she had left, or without making any inquiries of Jordan's relatives, with whom she had lived while cohabiting with him, as to his whereabouts. Prudence would have required that she should have made careful inquiry for her husband, before contracting the second marriage.

Courts cannot protect parties against the manifest consequences of indolence or gross credulity. While the petitioner and her little child were living separate from Jordan, and in her father's family, and before her marriage with Wyles, the latter resided in the same family for several years; during which time he occasionally met Jordan in Rome, with whom he was well acquainted. It would require some credulity to believe that the existence of such a cruel husband and heartless father was never the subject of conversation between the petitioner and the intestate, although it is true the petitioner was not interrogated on that point.

Henry Wright, a witness for the administrator, testified that in the spring of 1853 he had a conversation with the petitioner, in which he inquired of her if she had heard from Jordan, and that she replied that she had heard from him occasionally, and that he resided in Rome.

Walter Brown also testified to conversations with the petitioner in 1852–3, in which the conduct of Jordan was mentioned, in which she stated that Jordan had manifested a disposition to get possession of the child.

Without referring to the large mass of other testimony of a conflicting character, or to the question of the credibility of the witnesses sought to be impeached, I am compelled to the conclusion that the weight of evidence preponderates against the petitioner. There should be a *bona-fide* absence of the absconding person from the State, and without being known to the other party to be living; or, at least, such an absence from the county as would preclude the idea that the absconding person was living, after the most careful and diligent inquiry had been made.

The petition must therefore be denied, but without costs.

In order, however, to protect the rights of all parties concerned, I deem it my duty to place my decision on the construction I give the statute, based on the facts in the case, concerning which there was no conflict of evidence.

I cannot close this case, however, without expressing my deep regret that the children of the intestate should have in-

stituted these proceedings. They ·are represented to be in comfortable circumstances. The petitioner, without, help from the estate, would be destitute and needy. She was faithful and kind to their father—the mother of his child. Respect for his memory should have caused them to forbear making this claim. The sweets of humanity are more precious than dollars. It is devoutly to be hoped that they will reflect how much better they can afford to forego their claims, than, by insisting upon the strictness of legal rules, deprive the petitioner of the property in question. ·